**STATE of Minnesota, Respondent,**

v.

**Arthur Lee LINDSEY, Appellant.**

**No. 47786.**

Supreme Court of Minnesota.

Aug. 17, 1979.

Rehearing Denied Sept. 11, 1979.

Thomson & Nordby and Jack S. Nordby, St. Paul, for appellant.

Warren Spannaus, Atty. Gen., William B. Randall, County Atty., and Steven C. De-Coster, Asst. County Atty., St. Paul, for respondent.

Heard before PETERSON, SCOTT, and KENNEDY, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal by defendant, Arthur Lee Lindsey, from a judgment of conviction resulting from a jury verdict entered by the Ramsey County District Court for murder in the second degree. We affirm.

This case arose from the second of two fatal shootings on the evening of October 1, 1976, involving members of the Lindsey and Dodd families. The events of that evening began at approximately 7 p. m., in the home of Clifford Dodd, located at 838 Selby Avenue, St. Paul, Minnesota, at which time Clifford was confronted by Will, Edward, and Eugene Lindsey and Kevin Eaves. Apparently these four young men came to Clifford Dodd's house after hearing a rumor that Clifford was looking for Will Lindsey because of Will's alleged participation in a burglary of Clifford's home. Clifford ordered the men to leave his house, whereupon he was struck by Will Lindsey and a fight ensued. During the fight Will Lindsey drew a gun and shot Clifford in the hand. Clifford managed to escape from the

house and run to his car, which was parked in the adjoining driveway. The four men pursued him to the car, threatening to kill him. Clifford took his handgun from the car's glove compartment and fired two warning shots into the air. Eugene Lindsey began to flee at the sound of the first shot, but Will and Ed Lindsey continued to advance. Clifford fired twice at Will Lindsey, fatally striking him in the chest. Clifford then called the police and hid in a neighbor's house until they came. These facts are relatively undisputed and important only insofar as they explain what happened next.

Following the shooting, Ed Lindsey and Kevin Eaves carried Will's body down Victoria Avenue to a spot near the home of the Lindseys' sister, Eartha Mae Frazier. Meanwhile, Eugene Lindsey had run to the Lindsey family home at 932 Marshall Avenue and told his family of Will's shooting. Upon hearing that his brother had been shot, defendant picked up a .380 caliber semi-automatic pistol and ran to Clifford Dodd's house. At this point defendant's rendition of the facts[1] begins to conflict with the evidence presented by the prosecution.

Defendant testified that he went alone to Clifford Dodd's house hoping to find and aid his brother and brought the gun solely for his own protection. He further testified that he was invited into the Dodd house by Cordie Ranson, Clifford's sister, who, with her five young children, had been inside the house during the earlier fight. Cordie, however, testified that immediately after the initial shootings she fled to a neighbor's house and called the police. She claimed that upon returning to Clifford's residence she was confronted by defendant and his brothers Ed and Eugene,[2] who demanded to see Clifford and kicked in the door of the house looking for him; that defendant and Ed Lindsey searched the inside of the house, threatening Cordie and her children

1. Defendant did not testify at trial, but the state introduced tapes of his grand jury testimony, where he testified under a waiver of immunity.

2. Evidence at trial disputes Cordie Ranson's claim that Eugene Lindsey was at the house.

with their handguns; and that when they could not find Clifford inside the house they searched the outside and shot Clifford's barking dog. The state substantiated this story in part with photographs showing the kicked-in front door of the Dodd house.

Cordie testified that she and her children fled to a neighbor's house where she again called the police. This time, however, she also called her mother's house and spoke to her brother Acey Dodd, telling him that, "these crazy people are loose down here * * *," and explained how Clifford had been shot and the Lindseys had returned and broken into his house. She concluded the call by asking Acey to come and pick her and her children up.

Meanwhile, Lee Ames Lindsey (another of defendant's brothers) had been flagged down by Eartha Mae Frazier as he drove by Will's body. The police and paramedics came shortly after he arrived, so Lee Ames left the scene for the hospital. He drove south on Victoria and made a U-turn in an abandoned gas station at Victoria and Selby, across the street from Clifford Dodd's house. Here he saw his brothers, Ed and defendant. They got into his car to accompany him to the hospital. At approximately this same time, the police, Lucille Dodd (mother of Clifford, Acey, and Cordie), and Acey Dodd arrived on Selby Avenue near Clifford's house. Lucille Dodd was upset, spoke momentarily with her daughter Cordie, who appeared hysterical, and with the police, and then ran across Selby. She headed toward Lee Ames Lindsey's car, which had pulled back onto Victoria and was waiting for traffic to clear. Her son Acey followed her. Approximately 15 seconds after Lucille walked away from Cordie and the police, she was shot and killed by defendant.

Defendant testified that Lucille Dodd approached the car screaming obscenities. He claims that as she got near the car she

reached into her blouse, drew a small handgun and leveled it point-blank at his face.[3] Although he admitted shooting Lucille, defendant claimed that he did so in self defense after pleading with her not to shoot. After the shooting the Lindseys drove off. Ed and Lee Ames dropped defendant off near his house and continued on to the hospital. Defendant then threw his gun away and proceeded home. The gun was never recovered.

The state's evidence refutes the defendant's story. It is undisputed that Acey Dodd was the first to reach his mother; he testified that he neither saw nor removed a gun. Further, he testified that it was defendant, not his mother, who had screamed obscenities as Lucille approached the car. Police Officer George reached Lucille's body immediately after Acey and testified that he did not see a gun in the area. Moreover, he stated that when Lucille Dodd left his presence before the shooting she was not carrying a weapon and that her tight clothing was incapable of concealing one. Cordie Ranson also testified that her mother did not have a gun. The autopsy report disclosed that Lucille Dodd died of hemorrhaging resulting from five or six gunshot wounds.

This case presents the following issues:

(1) Did the trial court err in precluding the defendant's parents from testifying because they were not disclosed as possible witnesses?

(2) Did the trial court exhibit hostility to the defense or otherwise err by his sua sponte objection to defense evidence on relevancy and foundational grounds?

(3) Did the trial court's instructions cure any possible error resulting from the state's failure to supply the factual predicate or rebuttal to an impeachment question asked of a defense witness on cross-examination?

---

**3.** Ed and Lee Ames Lindsey also testified that Lucille Dodd had a gun. The defense also called Regina Kibble, a 14-year-old resident of the area who claimed to have witnessed the shooting. She testified that Lucille Dodd had a gun, but that it was in her purse when she was

shot. This testimony, however, was not entitled to much weight. Not only was there testimony that Lucille did not have a purse, but Regina's 13-year-old sister denied witnessing the shooting with her as Regina had claimed.

1. Prior to trial, the state, on two separate occasions, demanded disclosure from the defendant pursuant to Rule 9.02, Minnesota Rules of Criminal Procedure. At some point prior to trial the defendant, pursuant to Rule 9.02, subd. 1(3),[4] provided the state with a list of potential witnesses. This list, however, contained the names of only two of the eight witnesses the defense called or attempted to call at trial. Midway through the testimony of the defendant's mother, Leanna (an undisclosed witness), the prosecutor objected and moved that her partial testimony be stricken as a sanction for the defendant's noncompliance with the discovery rules. The prosecutor further moved to strike the completed testimony of the defendant's brother Mose Lindsey (an undisclosed witness) and to preclude the defendant's father (another undisclosed witness) from testifying. Substantial arguments were heard. Pursuant to Rule 9.03, subd. 8, Minnesota Rules of Criminal Procedure,[5] the trial court struck the partial testimony of Leanna Lindsey and precluded defendant's father from testifying. The trial court, however, allowed the completed testimony of Mose Lindsey to stand because the state had not objected at the time he testified.

Pretrial discovery rules fulfill an essential role in the criminal justice system. For example, in sustaining notice-of-alibi rules from constitutional challenge, the United States Supreme Court has noted that:

"Notice-of-alibi rules, now in use in a large and growing number of States, are based on the proposition that the ends of justice will best be served by a system of liberal discovery which gives both parties the maximum possible amount of information with which to prepare their cases and thereby reduces the possibility of surprise at trial. See, e. g., Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth?, 1963 Wash.U.L.Q. 279; American Bar Association Project on Standards for Criminal Justice, Discovery and Procedure Before Trial 23–43 (Approved Draft 1970); Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L.J. 1149 (1960). The growth of such discovery devices is a salutary development which, by increasing the evidence available to both parties, enhances the fairness of the adversary system. As we recognized in *Williams*, nothing in the Due Process Clause precludes States from experimenting with systems of broad discovery designed to achieve these goals. 'The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. We find ample room in that system, at least as far as "due process" is concerned, for [a rule] which is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence.' 399 U.S., at 82 (footnote omitted), 90 S.Ct., at 1896." *Wardius v. Oregon*, 412 U.S. 470, 473, 93 S.Ct. 2208, 2211, 37 L.Ed.2d 82, 86 (1973).

See, also, *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). Likewise, in Allyn, Pretrial Discovery in Minnesota, 60 Minn.L.Rev. 725 (1976), the author recognizes the important objectives served by pretrial discovery. As emphasized in that article:

"* * * Discovery avoids surprise, discourages false defenses, and aids in the detection of perjury by witnesses. More importantly, discovery saves time and ex-

---

**4.** Rule 9.02, subd. 1(3), Minnesota Rules of Criminal Procedure, provides in relevant part that "[t]he defendant shall supply the prosecuting attorney with the names and addresses of persons whom the defendant intends to call as witnesses at the trial."

**5.** Rule 9.03, subd. 8, Minnesota Rules of Criminal Procedure, provides as follows: "If at any time it is brought to the attention of the trial court that a party has failed to comply with an applicable discovery rule or order, the court may * * * order such party to permit the discovery or inspection, grant a continuance, or enter such order as it deems just in the circumstances. Any person who wilfully disobeys a court order under these discovery rules may be held in contempt."

pense in criminal proceedings. Reciprocal discovery, if used to its fullest extent, will encourage negotiated pleas or dismissals and avoid lengthy trials much in the same way discovery in civil actions avoids the expense of unnecessary litigation." 60 Minn.L.Rev. 736.

But, of course, for discovery to achieve its intended purposes the rules must be complied with, and this requires that adequate sanctions exist for their enforcement. As recognized by the drafters of the ABA Standards for Criminal Justice, "* * * rights and duties are ephemeral indeed without remedies." ABA Standards, Discovery and Procedure Before Trial, § 417, commentary at p. 107 (Approved Draft 1970).

Consistent with this, the Supreme Court has moved to ensure that the consequence of failing to comply with a discovery obligation is meaningful. Thus, in *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), the Court upheld against constitutional challenge preclusion of defense evidence as a sanction for noncompliance with a discovery order. In *Nobles*, the Court reasoned that:

> "* * * The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; * * *." 422 U.S. 241, 95 S.Ct. 2171, 45 L.Ed.2d 155.

In light of this holding, defendant does not challenge the trial court's preclusion order on constitutional grounds but instead argues that preclusion was not justified by the facts of this case. For the reasons set forth below, we must reject this contention.

■ The imposition of sanctions for violations of discovery rules and orders is a matter particularly suited to the judgment and discretion of the trial court. *Reid v. State*, Ind., 372 N.E.2d 1149 (1978). See, generally, ABA Standards, Discovery and Procedure Before Trial, § 4.7, commentary p. 107 (Approved Draft 1970). Indeed, the trial court is in the best position to determine whether any harm has resulted from the particular violation and the extent to which this harm can be eliminated or other-

wise alleviated. *Reid, supra*. Accordingly, we will not overturn its ruling absent a clear abuse of discretion. See, *United States v. Gillings*, 568 F.2d 1307 (9 Cir.), cert. denied, 436 U.S. 919, 98 S.Ct. 2267, 56 L.Ed.2d 760 (1978); *State v. Hunt*, 118 Ariz. 431, 577 P.2d 717 (1978); *People v. Goodman*, 55 Ill.App.3d 294, 13 Ill.Dec. 473, 371 N.E.2d 168 (1977). In exercising this discretion the trial judge should take into account: (1) the reason why disclosure was not made; (2) the extent of prejudice to the opposing party; (3) the feasibility of rectifying that prejudice by a continuance; and (4) any other relevant factors. *State v. Hunt, supra*, 118 Ariz. 434, 577 P.2d 720. See, generally, 1 Wright, Federal Practice and Procedure, Criminal, § 260. Analyzed in light of these considerations, the district court's preclusion order was not an abuse of discretion.

■ Prior to trial the defense disclosed the names of only two of the eight witnesses it ultimately attempted to call at trial. While this may not have been motivated by bad faith, neither can it be discerned from the record that there was justification for such disregard of the discovery obligation. Defense counsel cannot now justify his lack of disclosure by claiming that the decision to call these nondisclosed witnesses was not formally made until after the state had rested. Such an interpretation of the discovery obligation would render Rule 9.02, subd. 1(3), meaningless; in every case counsel could claim that the final decision to call any given witness was made only after the state had presented its evidence. As emphasized by the trial court, the defense had possession of a transcript of the grand jury proceedings for 3 or 4 weeks prior to trial, certainly adequate time in which to prepare the case.

Moreover, the state was, of course, prejudiced by this failure to make disclosure. Although it is true that the various police reports prepared in connection with its investigation of the shooting contained the names and addresses of defendant's parents, the prosecutor had not taken steps to independently investigate what they might

testify to because he had not been put on notice that they might be called at trial. And, finally, we recognize that the trial court had no other meaningful sanctions at its disposal; it was too far into trial to consider a continuance, and Rule 9.03, subd. 8, expressly limits the court's contempt power to willful violations of the rules.

■ Preclusion of evidence is a severe sanction which should not be lightly invoked. *Jones v. State*, 360 So.2d 1293, 1297 (Fla.App.1978); *People v. Olson*, 59 Ill. App.3d 643, 16 Ill.Dec. 660, 375 N.E.2d 533 (1978); Rezneck, The New Federal Rules of Criminal Procedure, 54 Geo.L.J. 1276, 1294 (1966). Here, however, preclusion was warranted and consequently we hold that the trial court did not abuse its discretion. The values sought to be achieved through reciprocal discovery will be attained only if the rules are properly observed, and to this end the trial courts must have the ability to make those obligations meaningful.

There seems little doubt that even if the defendant's contention that the trial court abused its discretion had merit, the error would have been harmless beyond a reasonable doubt.[6] If allowed to testify, Leanna Lindsey was only going to say that she went to the scene of Will's body with Mose, and saw Eugene there. The defendant's father was called only to relate the events surrounding the defendant's arrest later that evening. Neither witness possessed evidence related to whether defendant shot Lucille Dodd in self-defense, the predominate issue in the case. This testimony would have been quite unimportant and even cumulative. Further, the trial court even commented that the primary reason for calling the defendant's parents seemed to be "* * * to elicit the sympathy of the jury." Such testimony could also have been excluded on relevancy grounds.

2. At trial, defendant presented the testimony of Stanton Berg, a firearms expert. He explained and demonstrated the operation of a semi-automatic pistol. In large part his testimony covered the same area as that covered by the state's expert, James A. Gag. As Mr. Berg prepared to play a tape-recording of the sound caused by his firing of a semi-automatic pistol, the trial court interjected the following objection:

"THE COURT: Well, Mr. Buchman [the prosecutor] may be asleep but I am not. There is absolutely no foundation for playing that tape, none whatsoever."

The tape was never played, and afterwards the judge explained that his objection was based on both relevancy and foundational grounds. Defendant claims that the trial court committed a twofold error: first, in excluding probative and admissible evidence, and, second, in displaying partiality against the defense in the manner in which he excluded the evidence. Neither claim has merit.

■ Whether to admit evidence of experiments performed outside the jury's view rests in the sound discretion of the trial court. *State v. Fossen*, 282 N.W.2d 496 (Minn.1979); *State v. Darrow*, 287 Minn. 230, 234, 177 N.W.2d 778, 781 (1970). Accordingly, the trial court's ruling will not be overturned absent a clear showing of abuse of discretion. *State v. Johnson*, 291 Minn. 407, 412, 192 N.W.2d 87, 91 (1971). Here, the trial court was correct in excluding the experiment both on foundational and relevancy grounds. Moreover, in excluding the evidence the trial court did not display partiality against the defense. To the contrary, it is more likely that the jury interpreted the statement as being critical of the prosecutor. Overall, the court's rulings on evidentiary objections were fair and even-handed and could not have given the jury the impression that the court favored either the prosecution or the defense, see, *State v. Jones*, 271 N.W.2d 534 (Minn.1978). Thus, there is no merit to either of defendant's claims.

■ 3. The defendant's brother, Ed Lindsey, was called to testify by the defense. Like the defendant, Ed Lindsey was indicted for first and second degree murder

---

**6.** See, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v.* *Vance*, 254 N.W.2d 353 (Minn.1977); *State v. Roberts*, 296 Minn. 347, 208 N.W.2d 744 (1973).

in the death of Lucille Dodd. On cross-examination the prosecutor asked Ed Lindsey the following questions:

"Q. (By Mr. Buchman, continuing): Mr. Lindsey, isn't it true that within a matter of a few days after this incident, while you were still over in the County Jail, you spoke to a fellow prisoner over there, and you stated, 'Clifford shot my brother—'

"MR. THOMSON: Just a minute.

"Q. (By Mr. Buchman, continuing): '— well, he killed my brother, so we killed his mother.'?

"A. No.

"Q. You never made that statement?

"A. No."

Defense counsel objected and moved for a mistrial after the state rested without supplying the factual predicate for the question. The motion was denied, but the court did specifically instruct the jury that:

"You will recall at one point in the trial the prosecutor asked a witness, I believe Edward Lindsey on cross-examination, if he had previously made a certain statement to a prisoner in the Ramsey County Jail. You are instructed that there is no evidence in this case that any such statement was made, and you are, therefore, instructed to disregard the question in its entirety, and it is hereby stricken from the record in this case."

Notwithstanding this curative instruction, defendant argues on appeal that the question was improper and prejudicial. He claims (1) that the question concerned an out-of-court confession by Ed Lindsey which implicated the defendant and therefore would be inadmissible under the hearsay rule; (2) that the question presupposed a factual predicate that was never supplied; and (3) that it was error not to previously disclose the statement to the defense.

We are not persuaded by these arguments. Properly viewed, the questions do not violate the hearsay rule because the out-of-court statements were not offered to prove the truth of the matter asserted. See, Rule 801(c), Minnesota Rules of Evidence. Instead, the statement was used only as impeachment evidence to show a self-contradiction. See, generally, 3A Wigmore, Evidence (Chadbourne Rev. 1970), § 1018. Moreover, this is not a case where a question was asked implying a factual predicate which the examiner could not support. See, *State v. White,* 295 Minn. 217, 203 N.W.2d 852 (1973). The record shows that Clifford Dodd was in the courtroom and apparently prepared to testify that he overheard Ed Lindsey make the statement, but that the defense sought an early recess and Clifford was unable to testify. Clifford was sent home, and failed to return to the trial the next day. And finally, as respects the prosecutor's alleged failure to make timely disclosure of the statement, we need only point out that Ed Lindsey was another of defendant's undisclosed witnesses and that the prosecutor did not learn of his out-of-court statement until he was called to testify.

In any event, the trial court's instruction cured any possible error arising from the cross-examination. The trial court told the jury there was no evidence to support the question, told them to disregard it, and struck it from the record. We therefore affirm the conviction.

Affirmed.

WAHL, Justice (concurring specially).

I concur with the result reached by the majority in this case only because the excluded evidence was irrelevant. I cannot agree, however, that under the facts of this case the evidence should have been excluded under Rule 9.03, subd. 8, Rules of Criminal Procedure. Taking into account the factors which should guide the exercise of the trial judge's discretion in imposing sanctions for violations of the discovery rules, I am persuaded that the sanction of exclusion of the evidence was unwarranted.

The first factor to be considered is the reason why disclosure is not made. Although the majority recognizes that the failure to disclose may not have been motivated by bad faith, the opinion nevertheless states that defense counsel completely dis-

regarded the obligation of discovery. The record does not support this conclusion. Defense counsel did provide a list of potential witnesses in response to the prosecution's request. The names of the witnesses whose testimony was excluded were not disclosed because defense counsel was unaware of the need to call them until after the state had presented its case. Counsel stated in his offer of proof that he would use the testimony of these witnesses to impeach certain of the state's witnesses. Given these facts, the failure to disclose witnesses' names is not a "complete disregard of the discovery obligation," especially where the names and addresses of the witnesses as well as their relationship to defendant and their connection with the case were well known to the prosecution prior to trial and where defense counsel did not decide to have them testify until the day before he presented the case.

The second factor is the extent of the prejudice to the opposing party. The majority's assumption of prejudice is unwarranted by the facts. The police had investigated these witnesses, and the prosecution was aware of their names and addresses prior to trial. Nothing in the record indicates that their testimony differed from the information contained in the police reports. Defense counsel planned to have the mother testify that Eugene Lindsey was with her near Will's body at the time of the shooting and to have the father testify that defendant was not watching television at the time he was arrested, contrary to the testimony of prosecution witnesses. The prosecution could not claim that this testimony was a surprise because it was contained in the police reports. Nor did it undermine the prosecution's case, although it might have discredited some of its witnesses slightly. The prosecution, therefore, would not have been prejudiced by this testimony.

The third factor is the feasibility of a continuance to rectify prejudice. Because there was no prejudice in this case, there was no need to grant a continuance.

Finally, the trial court is to consider any other relevant factors. In the instant case the majority opinion fails to consider the fact that defendant was on trial for a most serious crime—first degree murder. Because the consequences of a conviction are so great, the trial court must be very careful not to exclude relevant testimony, to the detriment of the defendant, because of *counsel's* failure to disclose. In addition, the evidence in question did not relate to the central issue of the case, i. e., defendant's claim of self defense. Because of this, the prosecution would not have been harmed had the evidence been introduced.

Rule 9.03, subd. 8, Rules of Criminal Procedure, does not expressly authorize exclusion as a sanction. The committee which drafted the ABA Standards on Discovery and Procedure Before Trial, on which Rule 9.03, subd. 8, is based, intentionally deleted the provision of the federal rules of criminal procedure which permitted exclusion of evidence as a sanction:

> "Without rejecting this device as a useful sanction in some situations, some members of the Committee thought there would be difficulties in applying it against accused persons, and unfairness if the sanction was applied only against the prosecution. The Committee's general view, moreover, was that the court should seek to apply sanctions which affect the evidence at trial and the merits of the case as little as possible, since these standards are designed to implement, not to impede, fair and speedy determinations of cases." ABA Standards, Discovery and Procedure Before Trial, § 4.7 Comment.

Trial courts should exclude evidence only in the most · unusual situations, such as *State v. Chamberlain*, No. 46282 (1975), reported only in 7 Minnesota Practice and Procedure, § 464, where defendant deliberately and intentionally refused to disclose the names of his alibi witnesses. See, also, *State v. Pietrasweski*, 283 N.W.2d 887 (Minn.1979). Rather than excluding evidence as a sanction, the ABA committee recommends that sanctions be imposed directly on attorneys:

"With few exceptions (section 3.1, dealing with nontestimonial use of the person of the accused, and section 2.1(d), extending the duties of the prosecutor to his staff and certain others), the obligations imposed under these standards fall upon attorneys. Accordingly, it would seem appropriate to deal with breaches in the same way as infractions of bar discipline. Future canons of ethics might specifically so provide. Similarly, the courts' contempt power would seem especially appropriate to willful infractions by lawyers. Subsection 4.7(b) indicates that such sanctions should be applied to attorneys where appropriate. See also section 4.3 and Commentary, *supra,* on attorneys' duties with respect to custody of material disclosed." ABA Standards, Discovery and Procedure Before Trial, § 4.7, Comments.

Had the testimony been relevant, I do not believe that it should have been excluded under the facts of this case.

OTIS, Justice (concurring specially).

I join in the concurring opinion of Justice Wahl. In a given case the misconduct of counsel should not jeopardize a defendant's right to produce exculpatory evidence.

YETKA, Justice (concurring specially).

I join in the special concurrence of Justice Wahl.

ROGOSHESKE, Justice (concurring specially).

I join in the special concurrence of Justice Wahl.