STATE of Minnesota, Respondent,

v.

Jeffrey Alan GURSKE, Appellant.

No. C3–87–1506.

Court of Appeals of Minnesota.

May 10, 1988.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas Foley, Ramsey Co. Atty., Darrell C. Hill, Asst. Co. Atty., St. Paul, for respondent.

C. Paul Jones, State Public Defender, Mollie G. Raskind, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by HUSPENI, P.J., and PARKER and MULALLY *, JJ., without oral argument.

## OPINION

PARKER, Judge.

This appeal is from a judgment of conviction and sentence for second-degree murder, Minn.Stat. § 609.19(1) (1984). Appellant Jeffrey Gurske was sentenced to 210 months in prison. We affirm.

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

## FACTS

Jeffrey Gurske was convicted for the stabbing death of his wife, Carla Gurske, in their mobile home on November 20, 1985. Gurske admitted the stabbing, claiming it was committed in the course of a bitter domestic argument after his wife swung a knife at him. He also admitted setting a subsequent fire which severely damaged the mobile home and severely burned his wife's body. He denied pouring accelerant on his wife's face, as claimed by the state.

Gurske was initially tried for first-degree murder, Minn.Stat. § 609.185(3) (intentional murder in the course of committing arson), and second-degree intentional murder, Minn.Stat. § 609.19(1). The jury was unable to reach a verdict and a mistrial was declared. Before retrial, the court dismissed the first-degree murder charge, finding the state had shown neither a causal nor a motivational link between the arson and Carla Gurske's death. An appeal from this order was dismissed. *State v. Gurske*, 395 N.W.2d 353 (Minn.1986).

Gurske was charged with second-degree intentional murder. He requested submission of the lesser offense of heat-of-passion manslaughter, which was granted. Gurske admitted stabbing his wife and agrees the stab wounds caused her death. Thus, the issue for trial was whether Gurske acted in the heat of passion.

A number of witnesses testified that the Gurskes had marital problems. There was evidence that they had not had sexual relations for a number of months. Gurske testified that his wife made him sleep on the living room couch. A separation had been planned for November 1, then delayed until after the holidays. A "bone of contention" was his use of drugs, including marijuana and cocaine. The Gurskes had two children, Travis, age 3, and Amanda, seven months. Gurske testified that their marriage was strained by the demands of the children.

Gurske presented evidence that his wife was romantically involved with a co-worker, Jack Meyer, and testified that she told him she was cheating on him during the argument that led to her death. Meyer testified that he had rented a motel room on November 15, five days earlier, and spent the night there with Carla, but that they did not engage in sex. Meyer said that he had gone out with Carla for lunches and that they were in love with each other, but that they had never had sexual intercourse. On November 19, the evening before she died, they talked for two hours on the phone and she told Meyer she was going to have Jeffrey move out before the holidays.

Gurske testified that he was not aware of Carla's involvement with another man until the early hours of November 20. Meyer testified he wasn't aware that Carla's husband knew of their relationship.

The Gurskes' neighbors, Randy and Cindy Fisk, were aware of the Gurskes' marital problems. They testified to several incidents of Gurske threatening to kill his wife, although they did not take them seriously at the time.

Gurske testified that when he called Carla in the afternoon of November 19 to tell her he had received a pay raise, she was indifferent, which made him angry. Meyer testified that Carla came into his office after the call, was upset, and stated that Gurske had yelled and screamed at her.

When the Gurskes reached home after work, Gurske testified, he had to get ready to go to an evening school class. Carla went over to the Fisks about that time, and Gurske had to call her to return so he could leave. He testified that she became angry with him. Cindy Fisk testified that she did not see Carla Gurske at any time that day.

Gurske testified that when he returned from class, about 10:30 or 10:45, Carla and Travis were in the living room. She became upset when Gurske and his son played too loud. Gurske then hauled the garbage to the dumpster and also drove their truck to the store. Gurske testified that when he returned, Carla again became angry with him for letting Travis wake up the baby, and then for letting Travis take his sheathed deer hunting knife from his duffle bag. Gurske testified that he took the knife out of the sheath, gave the sheath

to the baby to chew on, and took the knife to the master bedroom to cut tagboard for his drafting class.

According to Gurske's testimony, the final argument began later, when the baby awoke. Gurske, who was asleep on the couch, woke and let her cry for awhile. He testified that Carla came out of the master bedroom, angry that he hadn't gotten up, and berated him, saying something he could not understand, and walked back to the bedroom. He followed her, demanding to know what she had said. In the bedroom, he grabbed her and demanded to know what was wrong. He testified that she then swung at him with a knife, striking his left hand, and told him to get out, that she didn't love him any more and that he wouldn't see his children again. She then told him she had been cheating on him; he approached her to take the knife away and they struggled, falling on the bed. He testified that he got the knife away and started punching her, not realizing he was inflicting knife wounds until he looked at her throat. He then thought she was dead.

Gurske testified that he set the fire to kill himself, not thinking of the children still in the home. He testified that he spread lighter fluid on the door and on a space heater in the bedroom. When the smoke alarm in the children's bedroom sounded, he said he crawled out and took the children, one at a time, to the truck.

Gurske then ran to the Fisks' house, sobbing hysterically and apparently in shock. They testified that he was blackened by soot and his hand was bleeding. He told the Fisks he had stabbed Carla and to call 911. Cindy Fisk ran out and found the children in the truck. She testified that the children and the inside of the truck were warm, although it was a bitterly cold night.

Gurske was taken to the hospital. He had burns on his head, mouth and arms and had suffered smoke inhalation. He had cuts on his left hand, which the medical examiner testified were consistent with defensive wounds. He had linear abrasions on his back, which the medical examiner testified could have resulted from a struggle.

The medical examiner, Dr. McGee, testified that the cause of Carla Gurske's death was knife wounds to her neck. He testified that a contributing cause was the carbon monoxide level (24 percent) in her blood, which, along with soot in her upper airway, indicated she was alive when the fire started. He stated that she could have lived 5 to 10 minutes, even 15 minutes, after the knife wounds were inflicted.

Her body was severely burned in the middle of the face, with fourth-degree burns also on the arms and legs. Dr. McGee testified that it was most likely the facial burning was due to an accelerant. He testified that, from the pattern of the burn, it could not have been caused by burning wood falling down on the face. He also stated on cross-examination that it was a possibility that "fall-down" had caused the facial burn.

Police testified there was "fall down" around the waterbed on which Carla was found. Fire Marshall Bruce Ryden testified there was no "fall down" on the victim's chest, but there was some on the bed. He testified there was evidence that an accelerant may have been sprayed on the waterbed. A fireman testified there was no "fall down" on the victim. The defense, however, introduced a TV news videotape purporting to show the firemen aimed a "straight stream" of water at the home that may have dislodged any "fall down" on the victim.

The trial court excluded proposed testimony from an undisclosed defense expert, Dr. Plunkett, on the cause of the facial burning. Defense counsel contended Dr. McGee's testimony had surprised him because it varied significantly from his testimony at the first trial and McGee had assured him that his testimony would be the same. The prosecutor stated that defense counsel had indicated early in the trial he might call a forensic pathologist, but had disclosed Dr. Plunkett only *after* Dr. McGee testified.

Defense counsel made an offer of proof that Dr. Plunkett would testify that accel-

erant was not poured on the victim's face. Plunkett testified at the sentencing hearing that the lighter fluid did not have enough energy to cause the severe facial burns. He testified that these burns and the burns to the arms and legs were caused by intense heat and/or "fall down."

The jury found Gurske guilty of second-degree murder. The trial court sentenced him to 210 months, a double durational departure, citing the particular cruelty of the multiple stabbings and subsequent arson, the victimization of the children, and the jeopardy to nearby homes. The court relied in part on Dr. McGee's testimony that accelerant had been poured on Carla Gurske's face.

## ISSUES

1. Did the trial court err in excluding Dr. Plunkett's testimony?

2. Was the evidence sufficient to establish that appellant did not act in the heat of passion?

3. Did the trial court abuse its discretion in imposing a double durational departure?

## DISCUSSION

### I

■ The trial court excluded Dr. Plunkett's testimony based on lack of defense disclosure, which Gurske does not dispute. The supreme court in *State v. Lindsey,* 284 N.W.2d 368, 373 (Minn.1979), identified the factors that should be considered in imposing sanctions for violations of discovery:

(1) the reason why disclosure was not made; (2) the extent of prejudice to the opposing party; (3) the feasibility of rectifying that prejudice by a continuance; and (4) any other relevant factors.

*See also State v. Vaughn,* 361 N.W.2d 54, 59 (Minn.1985).

Gurske claims Plunkett was not disclosed because he was assured that McGee's "soft and equivocal" testimony at the first trial on whether accelerant was poured on the victim's face would not change. We conclude, however, that Dr. McGee's testimony was not substantially different from his testimony at the first trial.

At the first trial Dr. McGee testified that the deep facial burns were "asymmetrical" with a "geographic deep appearance" that in his opinion was due to an accelerant. On cross-examination he agreed there was something "hot and burning" on the face, not necessarily an accelerant. He admitted it could have been debris if debris were present. At the second trial Dr. McGee incorporated into his opinion the fire investigators' finding that no debris was present on the victim. Otherwise, his testimony was only a shade less equivocal. Defense counsel could have anticipated some refinement of McGee's testimony from the first trial, in which felony murder (arson) generally was at issue and the specific question of whether accelerant was poured on the face was not as prominent.

The state was prejudiced by the nondisclosure because it could not prepare McGee to meet Plunkett's testimony or obtain a rebuttal witness. *See Lindsey,* 284 N.W. 2d at 373–74. The ruling came shortly before the case was to be submitted to the jury and too far into trial to permit a continuance. *Id.* at 374.

The imposition of sanctions for a violation of discovery rules will not be reversed absent a clear abuse of discretion. *Id.* at 373. Preclusion is to be used only as a last resort and then only if it will not prejudice the defendant. *State v. Vaughn,* 361 N.W. 2d at 59. There is evidence here that the defense, by failing to disclose, sought to obtain an unfair tactical advantage. *See Taylor v. Illinois,* — U.S. —, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (preclusion of defense evidence is not barred by the compulsory process clause because, although defendant is prejudiced, there was an intent to seek a tactical advantage). The exclusion of Dr. Plunkett's testimony was within the trial court's discretion.

Gurske also contends the trial court erred in allowing evidence of the arson and photographs of the victim's burned body. He claims this was plain error not waived by his failure to object. *See* Minn.R.Crim. P. 31.02. The arson, however, was rele-

vant as evidence of concealment in determining intent and mental state. Photographs of the body were relevant to the issue of where accelerant was placed.

## II

■ Gurske argues that the evidence, viewed in the light most favorable to the verdict, is insufficient to establish that he did not act in the heat of passion. He contends the circumstantial evidence does not

lead[ ] so directly to the guilt of the accused as to exclude, beyond reasonable doubt, any reasonable inference other than that of guilt.

*State v. DeZeler*, 230 Minn. 39, 52, 41 N.W. 2d 313, 322 (1950).

In reviewing a claim of insufficiency of the evidence, this court must view the evidence in the light most favorable to the state and determine whether the jury, having due regard for the state's burden of proving guilt beyond a reasonable doubt, could reasonably conclude the defendant was guilty. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). We must assume the jury believed the state's witnesses and discredited any contrary evidence. *State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981).

The direct evidence of a domestic argument sufficient to provoke Gurske to the heat of passion was limited to his own testimony. The credibility of that testimony was for the jury to determine. *State v. Daniels*, 361 N.W.2d 819, 826 (Minn.1985). There was circumstantial evidence: escalating marital strife, the planned separation, Carla Gurske's relationship with Meyer, and the quarrel on the afternoon of November 19. However, the jury is in the best position to evaluate the circumstantial evidence surrounding the crime. *State v. Anderson*, 379 N.W.2d 70, 75 (Minn.1985), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986). We note the jury also had evidence before it of Gurske's prior threats to kill his wife. Moreover, the knife sheath was found in the living room, a considerable distance from where the stabbing occurred. Finally, the medical examiner testified that the stab wounds were inconsistent with the punching motion Gurske described.

The state's case relied heavily on evidence of events occurring after the fatal stabbing, particularly the pouring of accelerant on the victim's face. Events after, as well as before, the death may be relevant to determining a defendant's state of mind at the time death was caused. *See State v. Andrews*, 388 N.W.2d 723 (Minn.1986) (defendant's actions indicating escape and failure to seek medical help for victim indicated intent and premeditation rather than accidental stabbing in the course of a struggle, as defendant claimed). We must assume the jury believed the state's expert testimony that accelerant was poured on Carla Gurske's face. The jury could reasonably have concluded this was an act of concealment inconsistent with heat-of-passion manslaughter. *Cf. State v. Salas*, 306 N.W.2d 832, 838 (Minn.1981) (evidence did not compel a manslaughter verdict, because no weapon was found on the victim, defendant did not testify he produced one, and defendant fired a second shot into the victim and beat him).

Some of Gurske's actions following the stabbing, including his admission to the Fisks, tended to negate the alleged act of concealment. However, it is the jury's function to draw inferences from the evidence and to reconstruct the events surrounding the unwitnessed stabbing. *See State v. Leinweber*, 303 Minn. 414, 417–18, 228 N.W.2d 120, 123 (1975). Despite his admission to the Fisks, Gurske lied to police and others about his wife's death. The jury was in the best position to evaluate this sometimes confusing and contradictory chain of events.

Gurske has presented a pro se brief and reply brief emphasizing the prejudicial nature of the evidence against him and arguing that the state failed to prove he did not act in the heat of passion. The drug and arson testimony was harmful to Gurske, but the trial court must balance the danger of unfair prejudice against the probative value of the evidence. Minn.R.Evid. 403. The evidence was probative on the issues of marital strife, bearing on possible provo-

cation, and intent. Finally, this court cannot retry the facts, but must view the evidence in the light most favorable to the verdict.

## III

 Gurske contends the trial court abused its discretion in imposing a double durational departure. We disagree.

The fire and resulting mutilation of the body was an aggravating factor, particularly given the expert testimony that the victim could have been alive when the fire was started. *See State v. Dircks*, 412 N.W.2d 765, 767 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. Nov. 24, 1987) (defendant set fire to victim's body when, medical evidence showed, she was still breathing). The victimization of the children was also a proper ground for departure. *State v. Profit*, 323 N.W.2d 34, 36 (Minn.1982). Although the children did not witness the stabbing, Travis, whom Gurske described as looking "bug eyed," saw the fire and smoke coming from the master bedroom and did not see his mother emerge. In a significant sense he was a witness to her death. The trial court at sentencing found that Gurske had poured accelerant on his wife's face. These factors amply justified a double durational departure.

## DECISION

The trial court did not abuse its discretion in precluding the testimony of Dr. Plunkett. The evidence was sufficient to support the conviction of intentional murder. The double durational departure was not an abuse of discretion.

Affirmed.