STATE Of Minnesota, Respondent,

v.

Michael Gary LEE, Appellant.

No. C7–91–430.

Supreme Court of Minnesota.

Nov. 13, 1992.

See also, 461 N.W.2d 245.

John M. Stuart, State Public Defender, Renee Bergeron, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, State Atty. Gen., Thomas Foley, Ramsey County Atty., Darrell C. Hill, Asst. Ramsey County Atty., St. Paul, for respondent.

GARDEBRING, Justice.

The appellant, Michael Gary Lee, asks this court to reverse his convictions on one count of first-degree murder and two counts of attempted first-degree murder. Appellant claims: (1) that his constitutional rights to due process were violated when the trial court precluded him from asserting a mental illness defense; (2) that the trial court abused its discretion in declining to instruct the jury on third-degree "depraved mind" murder; and (3) that the trial court abused its discretion by imposing consecutive sentences that included an upward departure in one of the sentences for attempted first-degree murder. We affirm in all respects.

Appellant was sentenced to consecutive sentences of life, 15 years and 20 years for the first-degree murder of Bethany Muller and the attempted first-degree murders of Laura Muller and Kristin Salyers. Until shortly before the crimes, appellant had been romantically involved with Laura Muller. They had dated for almost three years and lived together intermittently in his trailer home. Appellant verbally abused Laura, was highly possessive and objected to her spending time with family or friends. There was particular hostility between him and Laura's stepfather, Cliff Muller.

Around March 1, 1990, relations deteriorated and Laura moved back to her family's home in Roseville, although she and appellant continued to see each other. On

March 20, appellant and Laura argued in a restaurant parking lot after she had drinks with two male co-workers. When Laura refused to get in appellant's car, he smashed his windshield with his head and then shattered the passenger window of Laura's car with his fist. · Appellant indicated that if Laura made him angry again, it would be her and not her car that would be injured. Shortly after that, he put his head under a tire of Laura's car and told her to run him over because she "was killing him anyway." When Laura got home, her stepfather called police, resulting in a criminal charge against appellant and a "no contact" order.

Appellant did not see Laura again until she visited appellant's mother's home on May 20, 1990. She learned that he was trying to straighten out his life; he had started a job with his brother at a substantial salary and had started counseling. They started to see each other socially again. Then appellant lost the job because of a double hernia and had to undergo a hernia operation. After surgery, appellant was taking painkillers. After the pills ran out, he started drinking heavily. Laura continued her romantic involvement with him through his recovery period, but on June 4, 1990, she ended the relationship.

On June 5, while drinking heavily, appellant told a friend he was thinking of getting a gun and killing himself or Laura or her family. When the friend asked if appellant was going to kill Laura, he said he could never hurt Laura. At trial, appellant admitted talking about acquiring a gun, but said it was only to kill himself. Also on June 5, appellant called Laura repeatedly at her place of work, but she wouldn't take the calls. When she finally did, she told him to stop calling or she would notify police. He told her she would be sorry if she did. Appellant blamed Laura's stepfather for the breakup and on June 8 offered another friend money to beat up Cliff Muller. On June 9, appellant asked the same friend where he could get a gun. He also said he would get even with anyone who interfered with his relationship with Laura. At trial, appellant admitted offering the

friend money to beat up Cliff Muller but said he didn't mean it.

In the early-morning hours of June 10, appellant broke into the Muller home; he cut a window screen, then cut the phone lines. Laura was awakened by screams coming from the living room, where her 16–year–old sister, Bethany, had been sleeping on the couch. Appellant knew that was where Cliff Muller usually slept, but Cliff was out of town. Bethany was stabbed to death; it was later determined that she suffered 22 stab wounds to the chest, neck, face and arms. When Laura investigated the screaming, she came face to face with appellant and started backing up into the kitchen. He stabbed her 38 times in the chest area. When Laura fell to the floor, appellant turned around and went toward a bedroom occupied by Laura's friend Kristin Salyers and Salyers' 3–year–old son.

They had been awakened by the screams, and were sitting up in bed when appellant entered the room. Kristin Salyers huddled over her son on her hands and knees as appellant stabbed her repeatedly. The boy was not hurt, but he was covered with blood. During the attack, the tip of the knife blade broke off in Kristin Salyers' spine. The remaining knife blade broke about an inch from the handle before appellant discarded it. After appellant left, Kristin and her son went to a neighbor's home and called police. When officers arrived and tended to the injured victims, Kristin and Laura identified appellant as their attacker.

Appellant had fled the house, and police could not find him. Later that day, appellant's brother Bernard saw blood on his garage floor and followed a trail of blood drippings to a wooded area about a half-mile away. He found appellant standing at the base of a billboard, near a pool of blood. Appellant did not acknowledge Bernard's presence and, saying only that he was sorry, would not respond to requests to come home. Bernard returned home and told another brother, Steven, he had found appellant. Steven called police and directed officers to the wooded area. Ap-

pellant was not there, but police found words written in blood on some railroad tracks, a bridge, a billboard pillar and two pieces of wood in the form of a cross. The writing on the sign post said "I love my family and I'm very sorry but I wasn't happy without Laura" and it was signed "Mike."

Five days later, appellant's mother found appellant in the basement of her home. He appeared to be in shock. The family brought appellant to the Roseville police station that afternoon. At the time he was arrested, appellant had several cuts on his forearms, some of which were recent. When he was asked about the stabbings, appellant said he did not remember anything except drinking at a local bar. Appellant testified that he had been drinking on June 9 and had wandered around trying to find a way to kill himself. When he couldn't get a gun, he got a knife from his mother's house. He testified he somehow ended up at the Mullers' because he just kept thinking about Laura. He recalled being in the house and cutting something but did not know why.

Recounting the incident at trial, appellant testified he did not remember stabbing anyone on the couch. He recalled swinging at two other people and running down the hall but said he had no control over what was happening, although he remembered having the knife in his hand and seeing the blade fly off. Appellant denied that he intended to kill anyone except himself. He said that when he left the Mullers' he went to his mother's garage and slit his wrists with a razor, then left because he didn't want his family to find him dead.

█ Before trial, three different experts examined appellant to determine whether he was mentally ill at the time of the crimes. Two court-appointed experts, one for the defense and one for the prosecution, concluded that he was a troubled and depressed person, but that at the time of the crimes, appellant could not meet the M'Naghten standard for mental illness.[1] The only expert to hedge was Dr. McCafferty, a private psychiatrist hired by the defense, who said he could not reach a conclusion whether appellant's mental state at the time of the crimes met the M'Naghten standard. But Dr. McCafferty went on to say that appellant's conduct afterward suggested that he knew the wrongful nature of his actions and that he showed remorse.

Throughout the pretrial process, appellant's counsel said he did not plan to raise a mental illness defense. When the prosecution, pursuant to Minn.R.Crim.P. 9.02(1)(3)(a), sought a written notice of the intended defense, appellant's counsel replied "intoxication." During a pretrial hearing on October 12, 1990, appellant's counsel said he was awaiting Dr. McCafferty's report but that he did not expect it to support a mental illness defense. On October 22, 1990, appellant's counsel still had not received the report but stated flatly that he would not raise mental illness as a defense.

The McCafferty report was issued on October 29 and appellant's counsel received it shortly thereafter. Almost a month later, on November 26, 1990, appellant's counsel apparently shifted his strategy. Shortly after a jury panel was sworn and escorted out of the courtroom to complete voir dire questionnaires, appellant's counsel sought the court's permission to have Dr. McCafferty testify in support of either an intoxication defense or to buttress a third-degree "depraved mind" murder theory. Appellant's counsel said mental illness would not be asserted unless Dr. McCafferty's testimony was inadmissible in the proposed form. The trial court ruled that Dr. McCafferty's testimony was not admissible, except in support of a mental illness

---

1. The M'Naghten rule was first announced in *Daniel M'Naghten's case,* 10 Cl. & F. 200, 8 Eng.Rep. 718 (1843). It was adopted by this court in *State v. Gut,* 13 Minn. 341 (Gil. 315) (1868) and today is codified as Minn.Stat. § 611.026 (1990). The law holds that a defen-dant is not guilty by reason of mental illness if at the time of the criminal act s/he did not know the nature of the act or did not know that it was wrong because of a defect of reason caused by a mental illness or deficiency.

defense. Counsel then sought to raise that defense, but the trial court denied the request as untimely and unsupported by the record.

At trial, appellant attempted to show a lack of intent and premeditation and was able, through lay witnesses, to get in evidence about appellant's mental and emotional instability in the period before the crimes. The trial submitted instructions on first- and second-degree murder and attempted murder but denied appellant's request for an instruction on third-degree murder. The jury found appellant guilty on all charges and he was sentenced to consecutive sentences of life for the murder of Bethany Muller, 180 months (15 years) for the attempted murder of Laura Muller and 240 months (20 years) for the attempted murder of Kristin Salyers. The presumptive sentence for attempted first-degree murder is 180 months. Minnesota Sentencing Guidelines § II.G.

The first issue before this court is whether the trial court abused its discretion in precluding appellant's proposed mental illness defense. Appellant challenges the trial court's action on two grounds: (1) that it violated his constitutional right to put on a defense, and (2) that whether Dr. McCafferty's testimony would have supported a mental illness defense was a question for the jury, not the judge.

■ There is a due process right under the federal and Minnesota constitutions to assert a mental illness defense. *State v. Hoffman*, 328 N.W.2d 709, 715 (Minn.1982). But if an accused intends to raise any defense besides not guilty, s/he must notify the prosecution. Minn.R.Crim.P. 9.02(1)(3)(a). Disclosure of defenses is a discovery function under the rules. If a party fails to comply with discovery rules, the trial court may grant a continuance "or enter such order as it deems just in the circumstances." Minn.R.Crim.P. 9.03(8). "The imposition of sanctions for violations of discovery rules and orders is a matter particularly suited to the judgment and discretion of the trial court." *State v. Lindsey*, 284 N.W.2d 368, 373 (Minn.1979) (citation omitted). But "preclusion of evidence is a severe sanction which should not be lightly invoked." *Id.* at 374.

■ In *Lindsey*, we said that in deciding whether to preclude evidence as a sanction, the trial judge should take into account: (1) the reason disclosure was not made; (2) the extent of prejudice to the opposing party; (3) the feasibility of rectifying any prejudice by a continuance; and (4) any other relevant factors. *Id.* at 373. We will apply those factors to the present case:

1) *Reason for nondisclosure:* Appellant argues he was forced to switch to a mental illness defense at the 11th hour because the trial court rejected his attempt to use Dr. McCafferty's testimony in support of an intoxication defense or to establish third-degree "depraved mind" murder. We find appellant's position difficult to accept. Appellant hardly could have been caught off guard when the trial court declined to allow Dr. McCafferty to testify in support of an intoxication or third-degree murder defense. It has generally been understood for some years that the law in Minnesota precludes the use of psychiatric testimony on such questions. Our earlier cases have held that psychiatric testimony is not relevant to the issues of premeditation and intent, except in the second phase of a bifurcated trial where a mental illness is asserted. *See* Minn.R.Crim.P. 20.02 subd. 6(2)–(4); *State v. Brom*, 463 N.W.2d 758, 762 (Minn.1990); and *State v. Bouwman*, 328 N.W.2d 703, 705 (Minn.1982). Furthermore, appellant had Dr. McCafferty's report in hand on or shortly after October 29, 1991, yet waited until November 26 to notify the prosecution and the trial court that he wished to assert a mental illness defense. The record contains no explanation for appellant's keeping that information to himself. Whether appellant was acting in good faith or bad we need not decide. It is enough that we can find no legitimate reason for appellant's delay in announcing his intentions.

2) *Extent of prejudice:* Appellant contends that notwithstanding any delay in announcing his defense plans, there was no prejudice to the state. There is some merit to that argument. The state indicated it

probably would need a day, and at most a week, to adjust its voir dire questions to take into account the mental illness issue. But that doesn't solve the prejudice problem completely. To address the mental illness issue, the state also would have needed to contact its psychiatric experts, make sure they were available to appear on short notice and discuss their testimony. It would be unfair to the prosecution to force such last-minute arrangements when the only reason is defense counsel's failure to disclose his plans in a timely fashion.

3) *Feasibility of a continuance:* The record in this case suggests that a short continuance may have been feasible.

4) *Other relevant factors:* The biggest factor is that on three occasions defense counsel stated that he did not intend to assert mental illness as a defense. Appellant argues that the Rule 20 examinations and numerous discussions of appellant's state of mind made it obvious that mental illness could be an issue in this case. But that argument cuts both ways. If it was obvious that mental illness was a potential issue, appellant should have taken it upon himself to preserve that issue for trial instead of expressly rejecting it. Another relevant factor is that appellant had the skimpiest possible pretrial record to support a mental illness defense, in that only Dr. McCafferty expressed the slightest hesitation in rejecting the applicability of the *McNaghten* mental illness defense. It would have been arbitrary for the trial court to bar the mental illness defense on this basis alone. But when the lack of substance is combined with the late announcement, the trial court's ruling does not appear unreasonable. Finally, we must consider the integrity of the trial system. Whatever appellant's motives might have been, the plain fact is that he was in the best position to know whether a mental illness defense was a possibility and he waited until the final moment to inform the prosecution or the court that he was even seriously considering it. In the meantime, a jury panel was drawn and trial preparations were made. While the trial court should in every instance afford counsel significant flexibility in preparation of a defense in a difficult case, such last-minute surprises, if allowed to occur unchecked, would undermine the predictability of trial dates and needlessly hamper the administration of trials. We cannot condone such a result, especially when it was so easily avoidable.

Analyzing the *Lindsey* factors together, we believe that in the unusual circumstances of this case, the trial court did not abuse its discretion in precluding the mental illness defense. While it is true that a continuance may have been feasible and the prejudice to the state was not severe, it also is true that there was no valid excuse for appellant's untimely notice. This is not a case of appellant's counsel refusing to commit himself until all of the expert analysis had been received. Here, counsel flatly disavowed a mental illness defense, then sat on the expert report for almost a month before notifying anyone that he might change his mind. When that conduct is coupled with the lack of support in the record for a mental illness defense, we think the trial court acted within its discretion in precluding the defense.

That brings us to the question of whether the trial court invaded the province of the jury when it concluded there was little or no support in the record for a mental illness defense. In the second phase of a bifurcated trial, "[i]t is solely the function of the jury to determine the ultimate question as to whether or not the appropriate [mental] capacity exists." *Hoffman*, 328 N.W.2d at 717. Appellant argues that the trial court deprived him of his right to let the jury decide whether he was mentally ill under *M'Naghten.*

■ As we stated, if appellant had made a timely disclosure of his intent to plead mental illness, it would have been improper for the trial court to preempt a jury determination. But under the circumstances of this case, where there was no timely notice, the trial court acted within its discretion. As it was, appellant was able to use lay testimony to illustrate his unstable mental state. Once that information was in the record, appellant could have renewed his

request for bifurcation of the trial to determine whether mental illness excused his guilt. But no such motion was made, and we will not speculate on what result it might have produced.

Appellant next argues that the trial court abused its discretion by not instructing the jury on third-degree "depraved mind" murder. Minn.Stat. § 609.195(a) (1990) provides:

Whoever, without intent to effect the death of any person, causes the death of another by perpetrating an act eminently dangerous to others and evincing a depraved mind, without regard for human life, is guilty of murder in the third degree * * *.

■ Whether to submit a lesser-included offense to the jury lies within the sound discretion of the trial court. *Bellcourt v. State*, 390 N.W.2d 269, 273 (Minn.1986) (citations omitted). Third-degree murder is a lesser-included offense of first-degree murder. *Id.* "The test used in determining whether to submit a lesser-included offense to a jury is whether the evidence provides a rational basis for an acquittal on the offense charged and a conviction on the lesser offense." *Id.* (*citing State v. Leinweber*, 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (1975)).

■ Applying the *Bellcourt* test to this case, there was no serious basis for a third-degree murder instruction. Appellant no doubt had a depraved mind, without regard for the lives of the people he attacked, but that doesn't distinguish him from any other murderer. The third-degree murder statute "was intended to cover reckless or wanton acts committed without regard to their effect on particular persons." *State v. Jackman*, 396 N.W.2d 24, 30 (Minn.1986) (citation omitted). Appellant's acts cannot be considered merely reckless or committed without regard for their effect on particular persons when he went to the family home of his former lover, cut his way in through a window screen, cut the telephone lines to prevent outside communication, fatally stabbed the person sleeping in the spot normally occupied by Cliff Muller, a man he despised, then repeatedly stabbed his former lover and another house guest. On these facts, there was no rational basis under *Bellcourt* for an acquittal on first-degree charges, so there was no basis for a third-degree instruction.

■ We also reject appellant's assertion that the trial court erred in not allowing expert psychiatric testimony on appellant's intoxication. "The average juror has some experience with intoxication and is presumably able to consider the effect of alcohol consumption on the ability to act with intent." *State v. Fratzke*, 354 N.W.2d 402, 409 (Minn.1984). Whether expert testimony will be helpful to the fact finder is a decision within the discretion of the trial court. Rule 702, Minn.R.Evid. and 1977 committee comment. We see nothing in the facts of this case to suggest that the trial court abused that discretion in disallowing the proposed expert testimony.

■ Appellant next asserts that the trial court erred in its ruling that Dr. McCafferty could not testify regarding the depraved mind element of third degree murder. We construe this assertion to mean that the testimony would have been offered for the purpose of negating the presence of intent necessary to establish the charge of first degree murder. Under our holding in *State v. Bouwman*, 328 N.W.2d 703 (1982); and *State v. Brom*, 463 N.W.2d 758 (1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991), excluding the testimony was not error.

■ Appellant next challenges the trial court's decision to order consecutive sentences and to depart upward by 60 months in the sentence for first-degree attempted murder of Kristin Salyers. Ordinarily, if a person's conduct constitutes more than one criminal offense, s/he may be punished for only one of the offenses. Minn.Stat. § 609.035 (1990). But when crimes are committed against different persons in the same incident, the trial court has discretion to impose one sentence per victim so long as such sentencing doesn't over exaggerate the criminality of the defendant's conduct. *See* Minn.Stat. § 609.15, and *State v. Montalvo*, 324 N.W.2d 650, 652 (Minn.1982),

(*citing State v. Marquardt,* 294 N.W.2d 849, 850 (Minn.1980)); *Brom,* 463 N.W.2d at 765 (three consecutive life sentences appropriate where defendant killed family members with an ax); and *State v. Olson,* 291 N.W.2d 203 (Minn.1980) (three consecutive life sentences appropriate where defendant methodically burned victims to death).

Whether consecutive sentencing over exaggerates criminality is determined by this court, based on our observations of sentences in similar cases. *See State v. Norris,* 428 N.W.2d 61, 70–71 (Minn.1988). We believe that consecutive sentences are warranted in this case. The only differences between this case and *Brom* are (1) that appellant used a knife instead of an ax and (2) two of the victims survived.

As for the durational departure, the presumptive sentence for attempted first-degree murder is 180 months (15 years). Minnesota Sentencing Guidelines § II.G. The guidelines sentence must be imposed unless there are "substantial and compelling circumstances." *State v. Garcia,* 302 N.W.2d 643, 647 (Minn.1981). We decide whether such circumstances exist by applying "our collective, collegial experience in reviewing a large number of criminal appeals from all the judicial districts." *State v. Norton,* 328 N.W.2d 142, 146 (Minn. 1982). The issue is whether the defendant's conduct is significantly more or less serious than that typically involved in the crime in question. *State v. Broten,* 343 N.W.2d 38, 41 (Minn.1984).

The trial court departed on the sentence for the attempted murder of Kristin Salyers because of the vicious nature of the crime, as exemplified by the knife breaking off in her spine, and the fact that it took place while the victim was huddled over her young son. Appellant acknowledges that some of the factors cited by the trial court

have been found to support upward departures, but he argues that the trial court failed to consider mitigating factors. Appellant first argues that the trial court should have taken into account that he had no prior criminal record. This argument is without merit. Appellant's clean record already was taken into account in arriving at a criminal history score of zero, which determined the presumptive sentences for his offenses. To adopt appellant's position would be to factor criminal history into the sentencing formula twice. There is no basis for doing that.

Appellant's second argument is that the trial court ignored the fact that appellant was suffering from mental impairment at the time of the crimes. Extreme mental impairment has been held to mitigate against an upward departure. *State v. Wall,* 343 N.W.2d 22 (Minn.1984); *see also State v. Gilbert,* 448 N.W.2d 875 (Minn. 1989) (depraved mind assault). The emphasis should be on "extreme." In the present case, the experts overwhelmingly concluded that appellant's mental condition did not deprive him of control over his actions. He was depressed, angry and maybe impulsive, but he did not suffer from an *extreme* mental impairment that would warrant different treatment at sentencing.

In summary, we believe the trial court acted within its discretion in sentencing appellant. Therefore, the trial court's decision is, in all respects affirmed.

Affirmed.