STATE of Minnesota, Respondent,

v.

Henry Laverne PATTERSON, Appellant.

No. C8–97–1759.

Supreme Court of Minnesota.

Dec. 17, 1998.

**46**

John M. Stuart, Minnesota State Public Defender, Scott G. Swanson, Assistant State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Minnesota Attorney General, St. Paul, Michael O. Freeman, Hennepin County Attorney, by Gayle C. Hendley, Assistant County Attorney, Minneapolis, for respondent.

OPINION

GILBERT, Justice.

The issues presented in this first-degree murder appeal relate to evidentiary rulings of the trial court. The appellant, Henry Laverne Patterson, asserts that the trial court abused its discretion by precluding the testimony of an undisclosed witness as a sanction for violation of the discovery rules. Patterson also asserts that the trial court erred in allowing an individual whom the defense alleged committed the murders to testify as to the impact of the allegation on his employment and personal life. Because we conclude that the trial court did not abuse its discretion in these evidentiary rulings, nor was there plain error in admitting an answer to a question asked without objection, we affirm Patterson's conviction of three counts of first-degree murder.

Henry Laverne Patterson was convicted of three counts of first-degree premeditated murder for the June 27 or 28, 1996 homicides of his ex-girlfriend's mother, Ida Strouth, Ida's 9–year–old son, Jacob Strouth, and the Strouths' 13–year–old neighbor, Jeremiah Sponsel.

In 1994, Patterson began dating Sarah Strouth, Ida's daughter. Patterson and Sarah subsequently had a daughter together. Patterson was physically abusive to Sarah, and after several unsuccessful attempts to leave Patterson, Sarah moved into her own apartment on June 15, 1996. Sarah took their daughter with her and refused to tell Patterson her new address.

On several occasions, Patterson expressed anger about not being able to locate Sarah and their infant daughter. One of Ida's neighbors testified that in May of 1996 she heard a black man "yelling at Ida saying things like, 'Where is she, where are you hiding the bitch, I have a right to see my baby, you'll be sorry if you don't tell me

where she is.' "[1] Additionally, on June 22, 1996, Patterson took their infant daughter and refused to return her to Sarah for two days.

Antonio Brayboy had been an acquaintance of Patterson's for several years prior to the homicides. Brayboy accompanied Patterson to the scene of the homicides. Pursuant to a plea agreement, Brayboy pled guilty to three counts of accessory to first-degree murder, received a 9-year prison sentence, and agreed to testify against Patterson.

According to Brayboy, on June 27, 1996, Patterson invited Brayboy to the home of Patterson's mother, Theresa Patterson. Pursuant to this invitation, Brayboy and his father, William Hunter, went to Theresa's home on June 27. Brayboy and Hunter socialized at Theresa's home for a while, and then Brayboy, Hunter, and Patterson left together.

There are conflicting accounts regarding what time the three men left Theresa's home. Hunter testified that they left at "about three, four, something like that." Brayboy testified that he did not remember what time they left, but that it was still light and "on the way to getting dark." Brayboy further testified that he left work at approximately 3:30 p.m. and went home, where he received a phone call from Hunter asking Brayboy to pick him up. According to Brayboy, fifteen minutes after the call from Hunter, he received a phone call from Patterson inviting him to Theresa's home. Brayboy then picked up Hunter and the two drove around before going to Theresa's home, where they socialized for a while before leaving. Theresa testified that Patterson was present when she left her home at 6:00 p.m., but that he was not there when she returned at 9:30 p.m. Both Brayboy's and Theresa's testimony place the three men leaving Theresa's home substantially later than the 3:00 to 4:00 p.m. time frame testified to by Hunter.

Brayboy testified that, after leaving Theresa's home, the three men went to Eden Prairie to take Hunter to his mother's home. On the way, Patterson stated something to the effect of "I'm going to make her tell me

where she is." Neither Hunter nor Brayboy knew to whom Patterson was referring when he made these comments. After dropping off Hunter, Patterson asked Brayboy to take him "somewhere."

Brayboy testified that Patterson directed him to Ida Strouth's townhome in south Minneapolis, where Patterson had lived with Ida, Sarah, and Jacob Strouth until a few months before the homicides. Patterson and Brayboy walked to the backyard of Ida's townhome, where they saw Jeremiah Sponsel, the Strouths' 13-year-old neighbor who was spending the night at the Strouths'. Jeremiah went into Ida's townhome, and Patterson and Brayboy followed. Once inside, Patterson and Ida began arguing. During the argument Patterson repeatedly asked where Sarah was. When Ida refused to answer, Patterson hit Ida several times and threatened her with a gun.

Brayboy further testified that Patterson then took Ida and Jacob Strouth and Jeremiah Sponsel into the basement. At Patterson's request, Brayboy followed Patterson into the basement, where Brayboy sat on the steps and watched while Patterson murdered Ida and Jacob Strouth and Jeremiah Sponsel. During the murders, Patterson told Ida that she could not keep his baby from him. Following the murders, Patterson briefly attempted to clean up some of the blood, using a sock placed over his hand. Despite the details of the murder not having been made public, Brayboy testified in great detail as to the instruments used in the murders, the locations and types of wounds inflicted on the victims, and the particular order in which the wounds occurred. Brayboy's testimony was in accord with reports of the medical examiner and various investigators.

Sarah Strouth placed a call to Ida at Ida's place of employment on June 28. When Ida's co-workers told her that Ida had not come to work, Sarah went to Ida's townhome, where she discovered the bodies. Sarah immediately called the police, who arrived at the scene within minutes of the call.

Police found all three victims in the basement of the townhome. The time of death

---

1. *Patterson is African–American.*

was estimated at between midnight and 1:00 a.m. on June 28, 1996. The cause of death of each victim was complex homicidal violence. The victims' injuries included knife wounds, blunt force injuries to the face, head wounds caused by a hammer, and strangulation. None of the gruesome details of the murders were made public until the trial.

At the crime scene, police found several impressions consistent with a bloody, gloved hand. Police also found two sets of footprints in the basement. One set of footprints was from an unknown source. The other set of footprints matched a pair of shoes later seized from Patterson's truck; these footprints were also consistent with an imprint on Ida's face. None of Patterson's or Brayboy's fingerprints were found in the townhome.

Several people, including Sarah, immediately told police that Patterson might have committed the murders. Police arrested Patterson on the evening of June 28. At the time of his arrest, Patterson had a small spot of blood on his ear. There was such a minute amount of DNA in the blood that no definite identification of the blood source could be made. However, tests showed the blood to be a mixture of two or more persons' blood, and neither Patterson nor Jeremiah could be ruled out as possible sources. When questioned about the shoes seized from his truck, Patterson told police that a stranger sitting on a wall gave him the shoes after he observed Patterson walking barefoot on glass after having been robbed of his shoes, car keys, and $190 cash.

Brayboy subsequently discussed the homicides with several people, including Kim Sax. Kim is the mother of William Sax and is also Hunter's girlfriend. Brayboy had lived with Kim for approximately 5 years. Kim and Theresa Patterson were friends, and it was through this relationship that Brayboy and William Sax knew Patterson. Although the two are not biologically related, William Sax referred to Brayboy as his brother. Kim encouraged Brayboy to tell the police what he knew about the homicides. When Brayboy failed to do so, Kim called the police and told them that Brayboy had witnessed the murders. Police then arrested Brayboy at his home. Both Brayboy and Patterson were charged with and indicted on three counts of first-degree murder.

At trial, the defense alleged that William Sax, Brayboy's "brother," committed the homicides. Through a series of questions, defense counsel tried to imply that Sax and Brayboy went to the Strouths' townhome to rob them and that the robbery ended in the killing of all three people who were present at the residence. Brayboy denied all inferences that he actively participated in the killings. Brayboy also denied knowing that there were items to steal at the Strouths' townhome, or even knowing the location of the Strouths' townhome prior to being directed there by Patterson on the night of the killings. In response to the defense's accusation, the state called Sax as a witness. As part of his testimony, Sax testified about being told to go home from work the day that the *Star Tribune* newspaper ran an article regarding the accusation:

Q: Did you have any problems last week when you went into your job one morning?

A: Yes, I did.

(Defense objection on grounds of relevance overruled by the court).

Q: Did you have a problem?

A: Yes, I did.

Q: Was that problem because there was an article in the newspaper which accused you of being a murderer?

(Defense objection to leading the witness sustained).

Q: What was that problem about, Mr. Sax?

A: An article in the newspaper.

Q: What did that newspaper article say about you?

A: It said I was accused for murder.

Q: What did your employer do or say to you about that article that appeared in the newspaper accusing you of being a murderer?

A: They told me they didn't need me at work today, that I could just go home.

Q: What did you do about that? Were you able to do anything about it?

A: I contacted the Star and Tribune. I just went home. I talked to my family about it and they pretty much, you know, backed me as much as they could on it.

A few minutes later, the prosecutor asked Sax, "Has being accused of being a murderer caused you any problems, Mr. Sax?" Sax answered "yes" before defense counsel objected to this question as irrelevant. The trial court sustained the belated objection, telling the prosecutor, "I think you've gone about far enough with that."

The prosecutor asked four additional questions about what was published in the newspaper, and then asked Sax, "Is there anything you want to say to the jury about whether or not you committed these murders?" Defense counsel did not object to this question. Sax answered as follows:

All I want to say is that to be blamed for something this bad that you have not done and to wake up to go to work to face your whole family, to face the people you know, to face your community, to have a shame like this, something that you ain't even got involved with, to face, you know, even my daughter is something I couldn't even believe. And I think to even put my name in the paper like that, I think that's just dirty, outright dirty. That's just how I feel. I can't—it's kind of hard because, I mean, I could never do nothing like that and to be blamed for something like, I mean, people look at me like maybe I have had something to do with it, you know. My family's calling my house, "What's this in the paper", and stuff, and I don't—I'm not that type of person. I'm a hardworking, young man and I'm just trying to raise my family and that's all. That's really all I can say.

Defense counsel did not object to Sax's answer, but instead began cross examination by asking, "I take it, Mr. Sax, you now know how Henry Patterson feels then, right?" Patterson now argues that Sax's testimony was irrelevant.

Patterson also asserts that the trial court abused its discretion in imposing sanctions for a violation of the discovery rules. Early in the trial, defense counsel told the court that, to impeach Brayboy, he wished to pres-ent testimony of witnesses, the names of whom he did not want to disclose. Defense counsel argued that he did not have to disclose the information because of his "right of surprise." The trial court informed defense counsel that the information must be disclosed pursuant to Minn. R.Crim. P. 9.02, the rule governing witness disclosure statements.

Prior to the trial, the prosecution was unable to locate Linda Woodruff, one of its witnesses who allegedly drove Patterson from the location where Brayboy had dropped him off to Patterson's apartment and then to Theresa's house shortly after the murders. The defense refused to disclose any information regarding Woodruff's whereabouts, arguing that any such information was privileged. The defense had told Woodruff's friends and relatives, whom the prosecution believed were hiding Woodruff, not to talk to the prosecution. The court granted a continuance and directed defense counsel not to impede the prosecution's attempts to locate Woodruff.

Upon locating and deposing Woodruff, the prosecution learned that a defense investigator had tape-recorded an interview with her. The prosecution made a demand to review the tape. After defense counsel repeatedly refused to obey the court's order to surrender the tape, the trial court found defense counsel in contempt. The court considered sanctions and reserved the right to limit cross-examination. However, at trial, the court did not actually limit cross-examination. At the close of the prosecution's case in chief, the defense gave the prosecution what it claimed was the tape of the interview. The prosecution rested, but reserved the right to call the investigator who had made the tape.

Following presentation of its own evidence, the defense rested, but told the trial court that it would "offer some new stuff" after the prosecution's examination of the investigator. The investigator was then called to testify. Following the prosecution's examination of the investigator, the defense called and examined the sheriff's deputy in charge of maintaining Brayboy's custody records. The defense then attempted to call Leonard McAdoo, a previously undisclosed witness, to tes-

**50**

tify regarding Patterson's whereabouts between 4:00 and 4:45 p.m. on June 27, the evening of the murders. McAdoo is a chemical abuse counselor and would have allegedly testified that he had a counseling session with Patterson between 4:00 and 4:45 p.m. on June 27, 1996. McAdoo's testimony was unrelated to the investigator's testimony.

The sole reason the defense gave for not disclosing McAdoo was that defense counsel had been confused about the dates involved and therefore did not realize the importance of McAdoo's testimony until the night before defense attempted to call him as a witness. The defense had McAdoo under subpoena prior to the start of the trial, and McAdoo actually appeared at the trial on the first day for discussion with defense counsel. However, the prosecution was completely unaware of McAdoo, whom the defense attempted to call immediately prior to closing arguments. McAdoo's name was also not presented to the jury during voir dire. The trial court precluded McAdoo from testifying, stating, "Not only is there no notice of alibi in the formal sense of the word, but there has really not been a fair opportunity for the prosecution to deal with this." Patterson now asserts that this preclusion was an abuse of the trial court's discretion.

## I.

All defense witnesses in a criminal case must be disclosed pursuant to Minn. R.Crim. P. 9.02. Discovery rules are "based on the proposition that the ends of justice will best be served by a system of liberal discovery which gives both parties the maximum possible amount of information with which to prepare their cases and thereby reduces the possibility of surprise at trial" and are "designed to enhance the search for truth." *State v. Lindsey,* 284 N.W.2d 368, 372 (Minn.1979) (*citing Wardius v. Oregon,* 412 U.S. 470, 473, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973)) (additional citations omitted). The rules also provide for sanctions for violations of Rule 9.02, including ordering discovery, granting a continuance, holding counsel in contempt, or "enter[ing] such order as [the court] deems just in the circumstances." Minn. R.Crim. P. 9.03, subd. 8.

Trial courts have broad discretion in imposing sanctions for violations of the discovery rules. "The imposition of sanctions for violations of discovery rules and orders is a matter particularly suited to the judgment and discretion of the trial court. * * * Accordingly, we will not overturn its ruling absent a clear abuse of discretion." *Lindsey,* 284 N.W.2d at 373; *see also Cornfeldt v. Tongen,* 262 N.W.2d 684, 697 (Minn. 1977). We have held that four factors should be considered in determining appropriate sanctions for non-disclosure of witnesses: "(1) the reason why disclosure was not made; (2) the extent of prejudice to the opposing party; (3) the feasibility of rectifying that prejudice by a continuance; and (4) any other relevant factors." *Lindsey,* 284 N.W.2d at 373. Despite the trial court's broad discretion, "[p]reclusion of evidence is a severe sanction which should not be lightly invoked." *Id.* at 374.

In *Lindsey,* the defense disclosed only two of the eight witnesses it ultimately attempted to call at trial. 284 N.W.2d at 372. As a sanction for non-disclosure, the trial court precluded the testimony of the defendant's parents. Based on the above four factors, we affirmed and held that the non-disclosure was prejudicial because the "prosecutor had not taken steps to independently investigate what [the witnesses] might testify to because he had not been put on notice that they might be called at trial." *Id.* at 373–74. We further concluded that the non-disclosure was not justified and that the trial court could impose no other meaningful sanctions. *Id.* Additionally, because the witnesses could not testify as to the predominate issue in the case, but only to collateral issues, we concluded that even if the trial court had abused its discretion, the error would have been harmless because the "testimony would have been quite unimportant and even cumulative." *Id.* at 374.

Patterson now asserts that the failure to disclose McAdoo as a witness was in good faith, that the prosecution was not prejudiced because there would have been documentation as to McAdoo's testimony, and that any prejudice could have been overcome by a "very short recess." Patterson further as-

serts that McAdoo's testimony would have been critical because McAdoo's testimony that he was with Patterson between 4:00 and 4:45 on June 27, the evening of the murders, would have refuted Brayboy's testimony that Patterson was on the way to the murder scene at that time. Additionally, Patterson claims that McAdoo's testimony would have not only refuted Brayboy's testimony, but would have also "suggest[ed] that Brayboy and his father * * * ha[d] conspired to create a story which was not true." However, Brayboy testified that he did not know what time Brayboy, Hunter, and Patterson left Theresa's home, but that it was getting close to dark. It was Hunter who testified that they left between 3:00 and 4:00 p.m.

■ Based on the four *Lindsey* factors, we disagree with Patterson's assertions. First, the reason defense counsel gave for non-disclosure was an alleged mix-up regarding the dates on which McAdoo had seen Patterson. However, there is at least some indication in the record that the failure to disclose was willful or calculated. McAdoo was under subpoena by defense counsel prior to trial, yet was neither listed by defense as a witness as required by Minn. R.Crim. P. 9.02, nor otherwise disclosed to the state. Defense counsel displayed a pattern of failing to obey discovery rules, including asserting a non-existent "right of surprise" to rebut Brayboy's testimony, disobeying court orders for disclosure, and refusing to turn over discovery documents. A known witness, who was under subpoena by defense counsel and who actually appeared at trial to confer with defense counsel, should have been disclosed pursuant to Minn. R.Crim. P. 9.02.

Second, there can be little doubt that the prosecution may have been prejudiced by McAdoo's last minute testimony and that the trial court would have had no reasonable means of rectifying that prejudice. In *Lindsey*, we stated that, because the prosecutor had no opportunity to investigate what the witnesses might testify to, the prosecution was prejudiced by the non-disclosure. 284 N.W.2d at 373–74. Here, the prosecution had no indication that McAdoo was a potential witness and had no opportunity to discover what he might say. The prosecutor was also denied the opportunity to question jurors on voir dire as to their knowledge of or relationship to McAdoo. Additionally, in *Lindsey* we stated that, because the prosecution had already rested, the trial was too far along for a continuance to be granted. *Id.* at 374. Here, both the state and the defense had rested. The defense attempted to call McAdoo only moments before final arguments were to begin. At that point, any efforts to re-open the trial would have prejudiced the prosecution by over-emphasizing the importance of McAdoo's testimony, and the voir dire issue would remain unresolved. Accordingly, the trial court did not abuse its discretion in deciding that there was no feasible way to rectify any prejudice.

Finally, in regard to other relevant factors, McAdoo's testimony was not crucial to Patterson's defense. McAdoo's testimony would have served merely to impeach Hunter's testimony regarding the time frame of some of the early events leading up to the murders. However, other witnesses, including Brayboy and Theresa Patterson, had already cast doubt on the time frame to which Hunter testified. McAdoo's testimony would have been cumulative and covered a time frame hours before the murders. The preclusion of such testimony did not impede Patterson's ability to present a defense.

Consequently, we hold that the trial court did not abuse its discretion in precluding McAdoo from testifying.

## II.

Patterson next asserts that the trial court erred in allowing William Sax, whom the defense accused of committing the murders, to testify about the effects of the accusation at his job and on his personal life. Patterson argues that Sax's testimony was irrelevant and that the erroneous admission of the testimony necessitates a new trial.

The defense objected to the line of questioning relating to Sax's problems at work as being irrelevant, and the trial court overruled this objection. The trial court next sustained an objection to a leading question about the newspaper article. The trial court then sustained an objection to a question relating to

problems Sax encountered as a result of being accused of being a murderer and cautioned the prosecutor, "I think you've gone about far enough with that." There was no continuing objection to this line of questioning. Subsequently, the prosecution asked Sax the open-ended question, "Is there anything you want to say to the jury about whether or not you committed these murders?" Sax gave a narrative response to this question and generally discussed his feelings and reaction to the accusation. The defense did not object to this question or to Sax's narrative response.

 Generally, a party may not raise an issue relating to the admissibility of evidence on appeal if that party failed to object to such evidence at trial. *See State v. Beard*, 288 N.W.2d 717, 718 (Minn.1980). This court will review such evidence only if the admission of the evidence was plain error. *See Van Buren v. State*, 556 N.W.2d 548, 551 (Minn.1996). In determining whether plain error exists, this court applies a three-prong test: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). Each of the three prongs must be satisfied before this court will reverse a conviction based on an error not objected to at trial. *Id.*

 In this case, the third prong of the test has not been satisfied, and thus we need not decide the first two prongs. In order to satisfy the third prong, the defendant bears the heavy burden of showing that there is a reasonable likelihood the error had "a significant effect on the verdict." *Id.* at 741. At trial, the state presented overwhelming evidence of Patterson's guilt, including eyewitness testimony, motive and opportunity testimony, plus physical evidence such as shoes seized from Patterson's truck that matched footprints found at the crime scene. In considering the evidence, it is unlikely that Sax's narrative testimony significantly affected the verdict. Patterson has failed to meet his burden of satisfying the third prong of the three-prong test, and thus the admission of Sax's narrative testimony was not plain error.

 Furthermore, the trial court did not abuse its discretion in admitting Sax's testimony about the effects of the accusation on his employment in response to a question that was of a preliminary nature. The trial court has broad discretion regarding admission of evidence. We will not reverse the trial court absent an abuse of that discretion. *See Uselman v. Uselman*, 464 N.W.2d 130, 138 (Minn.1990).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. The effect the accusation had on Sax is not direct evidence of Patterson's guilt and therefore should be admitted only with caution. However, in light of the serious nature of the accusation made by the defense, under these facts it was not an abuse of discretion for the trial court to admit testimony regarding the effect of the accusation on Sax's life.

The state argues that a defendant's reaction to an accusation is often admissible, *see e.g., State v. Jackson*, 278 Minn. 374, 154 N.W.2d 827 (1967), and that, although Sax was not a defendant, his reaction to the accusation should likewise be admissible. We agree. In *State v. Brown*, 209 Minn. 478, 296 N.W. 582 (1941), we held that a defendant's silence in the face of direct accusation was admissible, stating, "[s]ilence under accusation permits an inference that the accused acquiesced in the statement and admitted its truth." *Id.* at 481–82, 296 N.W. at 585. Admittedly, Sax's testimony was not an immediate reaction to the accusation. However, his trial testimony was in response to questions regarding the accusation and was the first opportunity that Sax had to respond in court, the same forum where the accusation first arose. Had Sax remained silent and expressed no concern or distress regarding the accusations, an inference of acquiescence may have been raised, quite possibly at a point in the trial when the prosecution would have had no means of rebutting the defense's assertions. The trial court was cautious in admitting the testimony and limited the extent of this testimony. Accordingly,

we hold that the trial court did not abuse its discretion in admitting Sax's testimony about the effect of the accusation on his employment, nor was there plain error in the admission of Sax's narrative reaction testimony to which defense did not object.

Affirmed.