**STATE of Minnesota, Respondent,**

v.

**Deborah Ann KENARD, petitioner, Appellant.**

No. C1–98–1211.

Supreme Court of Minnesota.

Feb. 10, 2000.

John M. Stuart, Minnesota State Public Defender, Marie L. Wolf, Assistant State Public Defender, Minneapolis, for appellant.

Mike Hatch, Attorney General, St. Paul, Amy Klobuchar, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, for respondent.

## OPINION

PAGE, Justice.

Appellant Deborah Ann Kenard was convicted of one count of aiding an offender under Minn.Stat. § 609.495, subd. 1 (1998) and one count of aiding an offender under Minn.Stat. § 609.495, subd. 3 (1998)[1], for her involvement in concealing Ronald Hare's murder. Kenard was sentenced to one year and one day for her conviction under Minn.Stat. § 609.495, subd. 1, which is a severity level I offense under the Minnesota Sentencing Guidelines. Aiding an offender under Minn. Stat. § 609.495, subd. 3, is an unranked offense under the sentencing guidelines. The sentencing court ranked her conviction under subdivision 3 at severity level VII and as a result, Kenard was sentenced to an executed term of 68 months in prison. Kenard appealed on various grounds, including sentencing, and the court of appeals affirmed. We granted Kenard's petition for further review, but limited our review to the sentencing issues raised in the petition. Those issues are whether the sentencing court abused its discretion when it assigned offense severity level VII to Kenard's unranked offense and whether it was an abuse of discretion for the sentencing court, having assigned the offense severity level VII, to have sentenced Kenard to an executed term of 68 months in prison. Based on our conclusion that the sentencing court abused its discretion in assigning offense severity level VII to Kenard's offense under Minn.Stat. § 609.495, subd. 3, we reverse the court of appeals and remand to the sentencing court for resentencing.

On December 31, 1997, Kenard spent the early afternoon in her apartment with her four-year old son, Robert, and another child taking down Christmas decorations. Kenard's fiancé, Emmett Thomas, lived in the apartment and was also present. At about 1:00 p.m., Ronald Hare came to the apartment to visit Thomas. Shortly after Hare arrived, Thomas and Hare began arguing and using profanity. As a result, Kenard took the children to a nearby grocery store to get them away from the argument.

1. Minn.Stat. § 609.495, subd. 3 provides that: Whoever intentionally aids another person known by the actor to have committed a criminal act, by destroying or concealing evidence of that crime, providing false or misleading information about that crime, receiving the proceeds of that crime, or otherwise obstructing the investigation or prosecution of that crime is an accomplice after the fact and may be sentenced to not more than one-half of the statutory maximum sentence of imprisonment or to payment of a fine of not more than one-half of the maximum fine that could be imposed on the principal offender for the crime of violence.

When Kenard and the children returned approximately 45 minutes later, there was blood on the apartment's walls and floor. When Robert asked about the blood, Kenard told him it was paint and rushed the children to a back bedroom, telling them to stay there and watch cartoons. Kenard then returned to the living room and found Thomas pointing to the closet, which led her to assume that Hare was in the closet. She did not, however, check the closet. When Kenard asked Thomas what happened, he responded that he was just trying to defend himself. When Kenard said to Thomas, "Well, you didn't have to kill him," Thomas responded, "I didn't kill him, I just knocked him out."

Thomas asked Kenard to help him clean up the blood, which she did out of concern for the children. The cleaning process took about ten minutes. After cleaning up the blood, Kenard opened the closet door, checked Hare's wrist for a pulse, and finding none, told Thomas that Hare was dead and that Thomas had to remove Hare's body from the apartment because she did not want her son to see it. According to Kenard, Thomas moved Hare's body "about 45 minutes or an hour after we had cleaned up the foyer." When he moved the body, Thomas asked Kenard to hold the closet and apartment doors open and she complied. Thomas evidently moved Hare's body to a storage room in the building because later that night Thomas again asked Kenard to assist him in moving the body. She complied with his request by holding open both the door to a storage room and a door to the outside as Thomas removed Hare's body from the building.

Hare's body was found across the street from the apartment building by passersby at about 4:00 a.m. on January 1 and the police were called. The investigation led the police to Kenard's apartment. That afternoon, the police executed a search warrant at the apartment. Evidence obtained during the search led the police to believe that Hare had been killed in the apartment. When the police first questioned Kenard, she was uncooperative and denied having any knowledge of Hare's death. Eventually, Kenard informed the police that Thomas had killed Hare and that she helped Thomas clean up Hare's blood and held doors open so that Thomas could take Hare's body from the apartment and later from the building.

The Minnesota Sentencing Guidelines set out the procedure for sentencing offenders. The presumptive sentence for an offender is determined by locating the appropriate cell on the Sentencing Guidelines Grid. *See* Minnesota Sentencing Guidelines II. The first step in determining the appropriate cell is to determine the offense severity level for the offense of conviction. *See id.* at II.A. The severity level of the offense of conviction is located on the vertical axis of the grid. *See id.* at IV. The guidelines assign a severity level from I to X to most offenses, but certain offenses, such as those in violation of section 609.495, subd. 3, are left unranked. *See* Minnesota Sentencing Guidelines II.A. "When persons are convicted of offenses excluded from the Offense Severity Reference Table, judges should exercise their discretion by assigning an offense a severity level which they believe to be appropriate." *Id.* at II.A.05 comment. Beyond indicating that the sentencing court is to exercise its discretion in assigning an offense severity level to unranked offenses, the sentencing guidelines do not give any direct guidance as to what considerations should go into the exercise of that discretion.

■ That lack of guidance notwithstanding, we conclude that the sentencing court, on the facts presented here, abused its discretion when it assigned an offense severity level VII to Kenard's offense. We reach that conclusion for two reasons. First, because the sentencing court did not indicate on the record what factors, if any, it considered when it assigned offense severity level VII to Kenard's offense, it is almost impossible for a reviewing court to

evaluate the sentencing court's exercise of discretion.[2] *See State v. Kindem,* 313 N.W.2d 6, 7 (Minn.1981). The second reason is that it appears from the record that the sentencing court, rather than first determining the offense severity level as required by the sentencing guidelines, took the sentence recommended in Kenard's presentence investigation report and worked backward to find an offense severity level that would support a sentence approximating the recommendation.

 Because the sentencing guidelines do not give any direct guidance as to what should be considered when assigning an offense severity level to unranked offenses, we feel compelled to give some direction. The sentencing guidelines do provide a framework sentencing courts can use when determining the offense severity level of unranked offenses. The framework is found in the purposes of the sentencing guidelines, which are to:

establish rational and consistent sentencing standards which reduce sentencing disparity and ensure that sanctions following conviction of a felony are proportional to the severity of the offense of conviction and the extent of the offender's criminal history. Equity in sentencing requires (a) that convicted felons similar with respect to relevant sentencing criteria ought to receive similar sanctions, and (b) that convicted felons substantially different from a typical case with respect to relevant criteria ought to receive different sanctions.

Minnesota Sentencing Guidelines I. Relying on these purposes, we recommend that when assigning a severity level to unranked offenses, the sentencing court take into consideration the following: the gravity of the specific conduct[3] underlying the unranked offense; the severity level assigned to any ranked offense whose elements are similar to those of the unranked offense; the conduct of and severity level assigned to other offenders for the same unranked offense; and the severity level assigned to other offenders who engaged in similar conduct. No single factor is controlling nor is the list of factors meant to be exhaustive. Thus, while the sentencing court has discretion in sentencing for unranked offenses, information from the Sentencing Guidelines Commission on other offenders sentenced on the same or similar offenses can help guide the exercise of that discretion.

Kenard's conduct, while not as grave as that of Thomas, was nonetheless extremely serious. She was convicted of aiding the perpetrator to conceal the most serious of crimes, murder in the first degree. Her conduct, which included cleaning the crime scene, holding open doors so Thomas could dispose of Hare's body, and initially providing false information to the police, interfered with the investigation of Hare's death and had the potential to make Thomas' prosecution more difficult.

The ranked offense most similar to Kenard's offense is aiding an offender under Minn.Stat. § 609.495, subd. 1(a), which provides that:

Whoever harbors, conceals, or aids another known by the actor to have committed a felony under the laws of this or another state or of the United States with intent that such offender shall avoid or escape from arrest, trial, conviction, or punishment, may be sen-

---

**2.** The sentencing court stated "the sentence is based on really what I think is appropriate, in light of the severity of the crime," but the judge never mentioned what factors made severity level VII appropriate.

**3.** By specific conduct, we mean that conduct underlying proof of the elements of the offense. While we have held that such conduct cannot be relied on to justify an upward departure, *State v. Peterson,* 329 N.W.2d 58, 60

(Minn.1983), we conclude that its use is appropriate for setting the severity level for unranked offenses. Once the sentencing court has determined the severity level by considering the conduct underlying proof of the elements of the offense, it is not prohibited, in appropriate cases, from considering whether there are also aggravating or mitigating circumstances that would justify departure.

tenced to imprisonment for not more than three years or to payment of a fine of not more than $5,000, or both.

This offense is ranked at severity level I under the guidelines. Minnesota Sentencing Guidelines V (Offense Severity Reference Table). The primary differences between subdivision 1 and subdivision 3 of Minn.Stat. § 609.495 are that subdivision 3's application is limited to certain enumerated offenses while subdivision 1 is not so limited; and that subdivision 3 provides that those convicted thereunder may be sentenced to up to one-half of the statutory maximum of the aided offense. Obviously, the legislature considers convictions under subdivision 3 more serious than those under subdivision 1.

For purposes of comparing the offense severity level assigned to other offenders found to have engaged in conduct similar to Kenard's to the severity level assigned to Kenard, the parties have identified only one case. As it turns out, the offense in that case is aiding an offender in violation of Minn.Stat. § 609.495, subd. 1. That case involves Arneatrice Shaw (Henn. Cty. File No. 98–123289), whose conduct was virtually identical to that of Kenard. Like Kenard, Shaw came home to find that a loved one, in Shaw's case her son, had killed someone in her home. Also like Kenard, Shaw proceeded to help remove the victim's body from the home and then cleaned the house and washed blood from clothes in order to help her son avoid arrest. Shaw was charged under section 609.495, subd. 3, but was allowed to plead guilty to violating section 609.495, subd. 1. Thus, Shaw's virtually identical conduct was ranked at offense severity level I while Kenard's was ranked at VII. Given the virtually identical conduct, equity and proportionality suggest that the severity levels assigned to Kenard and Shaw's of-

fenses should not be so far apart. Such variations in severity level for the same conduct do not comport with the sentencing guidelines' goals of equity and proportionality. The legislature's intent of treating convictions under subdivision 3 more seriously than convictions under subdivision 1 may dictate a higher severity level for Kenard than Shaw, but there is nothing to suggest that Kenard's offense warrants a severity level six steps higher than Shaw.

For purposes of comparing the offense severity level assigned to Kenard's offense with that of others convicted of aiding an offender under section 609.495, subd. 3, our attention is drawn to cases involving Antonio Brayboy (Henn. Cty. File No. 96–071357), Eugene Myers (Benton Cty. File No. K9–96–521), Sathith Mevangsaksith (Henn. Cty. File No. 97–015813), Frank Soman (Ramsey Cty. File No. K3–96–4229), and Nickie Frank (Henn. Cty. File No. 98–095728) and Stacy Koerner (Henn. Cty. File No. 98–095714).[4] Brayboy was indicted for aiding and abetting first-degree murder but was allowed to plead guilty to one count[5] of aiding an offender under section 609.495, subd. 3, for his involvement in the brutal slaying of three people. Although Brayboy denied participating in the murders, he admitted to being present at the scene when they took place. *See State v. Patterson*, 587 N.W.2d 45, 47–48 (Minn.1998). He further admitted to helping the perpetrator flee the death scene. Brayboy's offense was assigned severity level VIII. Brayboy's presence at the time of the offense distinguishes his case from Kenard's.

Myers pleaded guilty to aiding and abetting attempted second-degree murder after he drove a stolen van while two other men severely beat the van's owner and then helped the two men drag the owner from the van into the woods, leaving him

---

**4.** This and the preceding cases, identified by court file number, are not reported cases but are from the records compiled on unranked offenses by the Sentencing Guidelines Commission for record keeping purposes.

**5.** Antonio Brayboy's plea agreement states that he pleaded guilty to one count of accessory to first-degree murder but *State v. Patterson*, 587 N.W.2d 45, 47 (Minn.1998), reports that Brayboy pleaded guilty to three counts of accessory to first degree murder.

to die. Myers offense, like Brayboy's, was also assigned severity level VIII. Mevangsaksith's offense of conviction arose out of his involvement in driving a car for friends who robbed two people at gunpoint. Mevangsaksith's offense was assigned severity level VII. Soman's offense of conviction arose as a result of Soman's presence during a robbery and grabbing some marijuana as he and another fled the scene. Soman's offense was assigned severity level VII. While the underlying offense in Kenard's case is far more serious than the underlying offenses in the cases of Myers, Mevangsaksith, and Soman, their conduct, which included some active participation in the underlying offenses, makes their offenses more serious. Thus, Kenard's offense should be ranked lower.

Frank and Koerner's offenses were assigned severity level VIII for their involvement in attempting to conceal the brutal rape and murder of a 13-year old Hmong girl. They became involved with the murder when the murderer, a classmate of theirs, called Frank and asked to use her car so that he could dispose of the victim's body. At sentencing, the court noted that Frank not only provided the car, but that she and Koerner voluntarily went along and helped the murderer dispose of the victim's body. While Frank and Koerner's offense is similar to Kenard's in terms of gravity, we note that it is distinguishable in that Frank and Koerner readily assisted the murderer when asked. In contrast, the murder in this case was thrust upon Kenard in her own home. Thus, we view Kenard's offense as less serious than theirs.

In each of these cases, Brayboy, Myers, Mevangsaksith, Soman, and Frank and Koerner, the offender was either present at the time of the underlying offense, participated to some degree in the underlying

offense, or readily participated in covering up the underlying offense.[6] In contrast, Kenard was neither present at the time of, nor participated in, Hare's murder. Moreover, she did not choose to become involved in concealing Hare's murder, rather she walked into her own home with two young children to find blood on the walls and floor and took steps to hide the murder from her 4-year old son. With these cases in mind, we remand to the sentencing court for a determination of the severity level of Kenard's offense, consistent with this opinion. We decline to reach the sentencing issue presented by Kenard's appeal. While on this record the sentence imposed on Kenard seems to be on the high side, because of our remand, we need not reach that issue at this time.

Reversed and remanded.

**6.** We recognize that another factor at work here is that in some of the cases used for comparison purposes, involving conduct substantially more serious than that of Kenard, the defendants pleaded guilty to lesser offenses. As a result, factors beyond the conduct underlying proof of the elements of the offense were likely considered in setting the offenders' severity level. However, that procedural difference, while one more factor to consider in the analysis, does not make the comparisons any less valid for purposes of insuring that the sentencing guidelines' goals of equity and proportionality are met.