STATE OF MINNESOTA

IN SUPREME COURT

A22-1206

Court of Appeals                                                    Anderson, J.

State of Minnesota,

                    Respondent,

vs.                                                            Filed: May 1, 2024
                                                        Office of Appellate Courts
Tyson Joe Hinckley,

                    Appellant.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Abby Wikelius, Lyon County Attorney, Julianna F. Passe, Assistant Lyon County Attorney, Marshall, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Adam Lozeau, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

A district court abuses its discretion in denying a defendant's assertion of a mental-illness defense when the defendant has proffered prima facie evidence of a mental illness that meets the requirements to be excused from criminal liability under Minn. Stat. § 611.026 (2022).

Reversed and remanded.

1

ANDERSON, Justice.

Tyson Joe Hinckley appeals his convictions of first-degree arson, second-degree burglary, and theft of a motor vehicle, arguing that he was wrongly denied his right to assert a defense of mental illness. Hinckley stole a vehicle from a garage, then started a fire that damaged the garage and an adjacent home. He was arrested near the fire. He sought to assert a mental-illness defense at trial and submitted multiple psychological reports from an expert attesting to his mental illness at the time of his offenses. In response to a motion brought by the State, the district court rejected the mental-illness defense, concluding that Hinckley had offered insufficient evidence establishing that he was, at the time of the offenses, acting under a defect in reasoning caused by mental illness. Hinckley was therefore precluded from asserting a mental-illness defense at trial. He was found guilty at trial, and the court of appeals affirmed the convictions.

Because we conclude that the district court abused its discretion by denying Hinckley the right to assert a mental-illness defense, and because the error in doing so was not harmless beyond a reasonable doubt, we reverse and remand.

## FACTS

In July 2019, police officers investigating an abandoned truck on a rural Lyon County property were alerted to a nearby garage fire. Arriving at the scene of the fire, officers encountered Hinckley standing only in boxer shorts and leaning against a wooden post. Hinckley gestured as if preparing to be arrested, then told a police officer that the Lyon County Sheriff had tried to murder him. Hinckley additionally claimed that police

had accused him of rape and pursued him on a boat with guns; he said that he "needed to talk to the FBI," was extremely animated, and was covered in mud and scratches. He told the deputy that he had set fire to the garage "for the protection of [his] life" and stole a van from the garage because he was attempting to escape. Hinckley demanded the FBI be contacted to conduct the investigation rather than local law enforcement; he believed that if local law enforcement conducted the investigation, evidence incriminating those agencies would be covered up.

A police investigator interviewed Hinckley at the scene of the fire. Hinckley asked if the investigator and the Lyon County Sheriff were friends, and then said he would only talk to the investigator if he accompanied Hinckley to see the evidence. Hinckley explained that he had spent the previous night in a river hiding from police and had left his clothing by the river. Hinckley offered to submit to a drug test, but the investigator declined the offer. Finally, Hinckley, after again admitting he had deliberately started the fire, said that he had done so to summon the fire department so that they could help him escape the pursuit of law enforcement.

Hinckley was charged with first-degree arson, Minn. Stat. § 609.561, subd. 1 (2022), second-degree burglary, Minn. Stat. § 609.582, subd. 2(a)(1) (2022), and theft of a motor vehicle, Minn. Stat. § 609.52, subd. 2(a)(17) (2022). On August 8, 2019, Hinckley filed a motion for an examination under Minn. R. Crim. P. 20.02, subd. 1, which permits a court to order the mental examination of a defendant when that defendant has notified the prosecutor of the intent to assert a mental-illness defense.

3

Psychologist George Komaridis (the psychologist) submitted an initial report to the district court regarding Hinckley's competency (First Report) on May 18, 2020. This report was based on interviews of Hinckley and Hinckley's family members and a review of police reports. The psychologist ultimately concluded that Hinckley, after experiencing trauma as a teenager, developed "heightened anxiety, depression and guilt," with Hinckley eventually resorting to marijuana and gambling as coping mechanisms. Hinckley admitted that, a year and a half before the garage fire, he had started using methamphetamine to deal with his depression. He began experiencing paranoia, hearing voices, and fearing that others were conspiring against him, and this culminated in his delusion that the police were "out to get [him]."

With respect to the offenses in question, Hinckley told the psychologist that the night before the fire, he suffered from hallucinations, and when he left work, he worried that he was being followed, leading him to hide in a riverbed. The next morning, he left the river, eventually arriving at the scene of the crimes. Hinckley knocked on the door of the home, but no one responded. Soon after he went into the garage where he found a white van with keys in it. Hinckley drove the van out past a cornfield, but when he thought he saw police passing by, he drove into the field, where the van became stuck. Panicking, Hinckley returned to the garage and started a fire to attract the attention of the fire department; he believed the fire department would "save" him because a fire department had previously extinguished a fire that Hinckley had accidentally set.

The psychologist diagnosed Hinckley with Post-Traumatic Stress Disorder (PTSD), Paranoid Personality Disorder, Persistent Depressive Disorder, Marijuana Use Disorder,

4

Alcohol Use Disorder in remission, and Stimulant Use Disorder, amphetamine type. The psychologist traced the PTSD and Paranoid Personality Disorder back to the trauma Hinckley suffered as a teenager and not to drug use. The psychologist concluded, however, that Hinckley's drug use, particularly methamphetamine use, had left him "decompensated to the point of not being able to care for himself or survive independently." The psychologist also concluded that Hinckley's cognitive functions had been affected "to the extent that he was not able to think clearly, make rational decisions, or maintain clear perceptions of his reality," and that these characteristics were present when Hinckley committed the offenses. Additionally, the psychologist noted that Hinckley still believed law enforcement was seeking to harm him at the time of his psychological evaluation, months after he was arrested.

The psychologist concluded that Hinckley was mentally ill at the time of his offenses, and that mental illness was the root cause of his paranoid thoughts and delusions of persecution, increasing in prominence leading up to the offenses. The psychologist further stated:

> Hinckley's mental illness created a defect of reason by virtue of his belief that he was being pursued by people who intended to kill him and that he had to do whatever it took to save his life. At that point, he was not able to rationally acknowledge the wrongfulness of his act of setting fire in another person's garage because his instincts to survive overrode his capacity for rational judgment.

This language mirrors statutory language establishing the required mental state to excuse criminal liability as a result of mental illness. *See* Minn. Stat. § 611.026 (2022).

5

The State moved to preclude assertion of a mental-illness defense alleging that Hinckley's behavior was caused by voluntary methamphetamine use rather than mental illness, and voluntary intoxication precludes a mental-illness defense. On October 7, 2021, the district court granted the motion precluding the mental-illness defense but allowed Hinckley to move for reconsideration if an additional expert witness report was submitted to the court. The order granting the State's motion concluded that the psychologist was unclear as to whether Hinckley acted under a defect of reason solely due to mental illness, or whether Hinckley's actions were at least partially explained by voluntary intoxication due to use of methamphetamine. The court also quoted an expert retained by the State, who stated in her report, unequivocally, that Hinckley was not suffering from a mental illness independent of drug use and that Hinckley's symptoms were caused by methamphetamine intoxication.

The psychologist submitted a supplemental report (Second Report) that again reiterated that Hinckley's mental illness preceded his drug use and that Hinckley suffered from PTSD, specifically disputing the claims made by the State's expert. The psychologist also re-interviewed Hinckley and found that Hinckley had suffered delusions regarding law enforcement at various times after his teenage trauma. Hinckley reported an incident to the psychologist that involved Hinckley's service on a grand jury in an arson and murder case. Hinckley feared that one of the police officers present at the grand jury proceedings suspected Hinckley of murder, causing Hinckley to be paranoid and "hypervigilant." As a consequence of the grand jury experience, Hinckley came to believe that he was under surveillance by police. The psychologist reported that even though this incident occurred

6

over 2 years earlier, Hinckley was still convinced of continuing animus by the police to Hinckley, demonstrating continuing paranoia.

The district court rejected the motion to reconsider the mental-illness defense. In its order, the court stated that the psychologist was still equivocal on the issue of whether voluntary intoxication was the basis for Hinckley's mental defect at the time of his offenses. Hinckley had therefore failed to make a prima facie showing that Hinckley's mental illness had caused the failure to know the nature of his actions or that those actions were wrong. The court continued to rely on the failure of the expert witness reports to exclude voluntary methamphetamine use as the cause, in whole or in part, of the actions of the defendant.

Hinckley submitted another report from the psychologist (Third Report), that specifically rejected voluntary intoxication as the cause of Hinckley's mental illness. The psychologist also stated, however, that "there is no way to objectively establish the degree to which a mental illness or drug abuse contributes to the person[']s defect of reasoning at any particular time," and that "one or both could have potentially caused the impairment and . . . neither one alone could be established as the sole cause of the impairment." This report further explained that Hinckley's expert had never opined that Hinckley's defect of reason was due to the involuntary use of drugs.

The district court rejected the second motion for reconsideration of the preclusion of a mental-illness defense. The court stated that Hinckley was asserting voluntary intoxication, even though the psychologist's reports never explicitly made that argument, and the third, and last, report referenced involuntary intoxication. Hinckley, who had

7

previously waived a trial by jury, was found guilty on all three charges by the court. Hinckley was given a sentence of 1 year and 1 day for motor vehicle theft, with execution of the sentence stayed. The second-degree burglary conviction resulted in a sentence of 23 months, with execution of that sentence also stayed. For first-degree arson, Hinckley was sentenced to 58 months in prison.

Hinckley appealed, claiming that the district court abused its discretion by precluding the assertion of a mental-illness defense. The court of appeals affirmed the district court. *State v. Hinckley*, No. A22-1206, 2023 WL 4417383 (Minn. App. July 10, 2023). This appeal followed.

## ANALYSIS

### A.

Both parties agree that the district court's decision to grant the State's motion to preclude the assertion of a mental-illness defense at trial should be evaluated under an abuse of discretion standard—a conclusion supported by our case law. *See State v. Lee*, 491 N.W.2d 895, 899–900 (1992) (excluding a mental-illness defense was not an abuse of discretion when defendant failed to give prosecution notice of that defense).

Minnesota law allows a mental-illness defense in a narrow circumstance. A person is not "excused from criminal liability except upon proof that at the time of committing the alleged criminal act the person was laboring under such a defect of reason, from [either mental illness or cognitive impairment], as not to know the nature of the act, or that it was wrong." Minn. Stat. § 611.026. When a defense of not guilty by reason of mental illness or mental deficiency is validly raised, there is a bifurcated trial process. The first part of

8

the trial addresses whether the elements of any charged offense have been proven beyond a reasonable doubt. Minn. R. Crim. P. 20.02, subd. 7(a), (c). After a guilty verdict is returned, the trial then enters a second stage in which the defendant's mental state at the time of the charged offense is evaluated by the fact finder. *Id.*

The standard for whether a defendant has validly raised a mental-illness defense is derived from *State v. Martin*, 591 N.W.2d 481, 486 (Minn. 1999). In *Martin*, we stated that, although defendants have a right under both the federal and state constitutions to assert a mental-illness defense, "[t]he law presumes sanity and the defendant has the burden of proving each element of the defense of mental illness or mental deficiency by a preponderance of the evidence." *Id.* We additionally held that, before a bifurcated trial process may be used as required under Rule 20.02, "a defendant must present prima facie evidence of mental illness." *Id.* at 487. The parties dispute whether the three reports from the psychologist are sufficient to meet *Martin*'s threshold requirement.

*Martin* does not directly address what the prima facie standard requires in the context of a mental-illness defense. In *Martin*, we noted that the defendant is not entitled to assert the defense if the record provides little or no support for a mental-illness claim. *Id.* at 486. Because Martin only presented evidence that he was voluntarily intoxicated at the time of the offense and presented no evidence that he had a mental illness, we rejected the defense of mental illness. *Id.* at 487. But in *Martin* we also cited *City of Minneapolis v. Altimus*, 238 N.W.2d 851 (Minn. 1976), as "the best starting point" in evaluating the requirement to make a prima facie showing of mental illness. 591 N.W.2d at 487.

9

In *Altimus*, the defendant had altercations with a police officer and engaged in reckless driving. He asserted an involuntary-intoxication defense, claiming that a Valium prescription had unexpectedly caused him to lose control of his actions. 238 N.W.2d at 854. Although we did not specifically address the prima facie standard for a mental-illness defense, the facts of *Altimus* demonstrate that the burden on the defendant in establishing a prima facie case of mental illness is not substantial. In *Altimus*, we held that a sufficient evidentiary proffer had been made to permit an involuntary-intoxication defense even though the defendant's witness—the doctor who had prescribed the Valium—could only state that "he did not know" if Valium would have caused the defendant's confusion regarding his own identity, and only stated that the defendant "*might* have been suffering from the effects of the drug" when he committed his offenses. *Id.* (emphasis added). *Altimus* otherwise provides little guidance.

Given the state of the law, we take this opportunity to clarify the appropriate standard. We begin by defining prima facie evidence, which is "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." *Prima Facie Evidence*, *Black's Law Dictionary* (11th ed. 2019). We have also said previously that "a prima facie case simply means one that prevails in the absence of evidence invalidating it." *S. Minn. Beet Sugar Coop. v. County of Renville*, 737 N.W.2d 545, 558 (Minn. 2007) (quoting *Tousignant v. St. Louis County*, 615 N.W.2d 53, 59 (Minn. 2000), quoting, in turn, *Trudeau v. Sina Contracting Co.*, 62 N.W.2d 492, 498 (1954)). This formulation has long been our standard. In *Hogan v. Atlantic Elevator Co.*, we held that prima facie evidence is established in circumstances in which the evidence proves a fact

10

"in the absence of any opposing, suspicious circumstances." 69 N.W. 1, 2 (Minn. 1896) (citing *Wright v. Larson*, 53 N.W. 712 (Minn. 1892)).

Thus, evidence submitted by the defendant to warrant a bifurcated trial must be sufficient to establish, without consideration of any contradictory evidence, that "because of mental illness or cognitive impairment, the defendant, at the time of committing the alleged criminal act, was laboring under such a defect of reason as not to know the nature of the act or that it was wrong." Minn. R. Crim. P. 20.02, subd. 4(b); *see also* Minn. Stat. § 611.026 (governing criminal responsibility of persons with a mental illness or cognitive impairment). That evidence need not be definitive or beyond challenge; it need only be sufficient to meet the standard set out in the rule.

Because a *prima facie* standard applies, it is not appropriate for a district court to weigh the evidence presented by the defendant against contrary evidence proffered by the State.[1] It is appropriate, however, and necessary, for the court to carefully consider any claims by the State that the evidence is not sufficient to meet the prima facie standard. Ultimately, though, following a determination that the prima facie standard has been met, the disputed issues of competency, and consideration of expert testimony offered by both

---

[1] We note that here the State submitted a competing expert report, alleging that Hinckley was not mentally ill, but rather was voluntarily intoxicated at the time of the relevant events. We do not hold that it is never appropriate for the State to provide expert evidence at the preliminary determination stage. Here, however, the State's report simply disagreed with the conclusions reached by the psychologist, and the place for that argument is during the competency phase of the trial, not during the determination of whether Hinckley has met the prima facie standard.

11

the defendant and the State, are considered by the jury following the first phase of the trial.[2]

*Martin*, 591 N.W.2d at 487 (noting that the *jury* is entrusted with determining mental capacity).

Applying this standard here, the State argues that the psychologist's opinions and conclusions include inconsistencies and various weaknesses and are not definitive. Collectively, however, all three reports submitted by Hinckley provide evidence adequate to meet the prima facie standard and thus to permit Hinckley to offer a mental-illness defense.[3]

Hinckley was diagnosed with multiple mental illnesses, including PTSD and Paranoid Personality Disorder. The psychologist concluded that Hinckley was cognitively, emotionally, and behaviorally impaired by his mental illness, and that the paranoid thoughts and delusions caused by the mental illness were increasing in prominence up to the time Hinckley committed the acts resulting in his prosecution. The First Report stated explicitly and unequivocally that Hinckley suffered from mental illness, specifically noting "at the time of the instant offense, Mr. Hinckley's mental illness created a defect of reason by virtue of his belief that he was being pursued by people who intended to kill him and

---

[2]     The need to follow these procedures was not obviated by Hinckley's waiver of his jury trial right. Rule 20.02, subdivision 7, requires the same bifurcated trial whether determined by "[t]he court or jury."

[3]     Because we conclude that all three reports from the psychologist that were submitted to, and accepted by, the district court collectively establish that Hinckley is entitled to assert a mental-illness defense under Rule 20.02 of our Rules of Criminal Procedure, it is unnecessary to decide if any of the reports individually were sufficient to meet the prima facie standard.

that he had to do whatever it took to save his life." It said that "he was not able to rationally acknowledge the wrongfulness of his act [of setting fire to the garage]." It concluded, in language echoing the legal standard for a mental-illness defense, that "Mr. Hinckley was laboring under such a defect of reason as to not know that his act at the time of the instant offense was wrong" due to a "persistent co-occurring set of disorders."

The Second Report stated that Hinckley had "intrusive thoughts" before any drug use, implying that he had a disturbed state of mind not entirely caused by methamphetamine abuse. It also stated that Hinckley became "hypervigilant" around peace officers approximately 6 to 8 months before his offenses due to an encounter with a specific peace officer who pulled him over for "suspicious activity." The interview conducted before the Second Report revealed that Hinckley still believed that the specific officer harbored ill-will toward him—indicating that his paranoid delusions were persistent. The psychologist stated in his second report that he stood by his conclusions in his first report.

The Third Report emphasized that Hinckley's "mental illness preceded his use and subsequent abuse of alcohol and drugs, which in later years also appeared to affect his behavior and reasoning." It also said that "Mr. Hinckley's mental illness was not in any way the result of his use of drugs but was only exacerbated by those drugs." Additionally, the psychologist noted that the mental illness "cannot be discounted as a potential cause of [Hinckley's] defect of reasoning," while his "use of methamphetamines cannot be established as an independent cause of his defect of reasoning because its use was preceded by his mental illness." Although he went on to say that "one or both [of the mental illness

13

or use of methamphetamines] could have potentially caused the impairment," he also said that "neither one alone could be established as the sole cause of the impairment."

The district court, in rejecting Hinckley's mental-illness defense, focused on the claim by the State that the psychological reports were insufficient because of lack of clarity on the issue of voluntary intoxication by Hinckley (i.e., that Hinckley's inability to know the nature of his acts or that they were wrong was caused by voluntary intoxication rather than mental illness). The district court is not wrong in noting some equivocation in the psychological reports, and the possibility of concurrent causation.[4]

But these are trial issues, to be explored, if necessary, in the second phase of the trial, by testimony from witnesses (expert and otherwise), cross-examination of those witnesses, and argument from counsel. Even if the district court is correct that some of the reports submitted by Hinckley are unclear or contradictory on the issue of voluntary intoxication, Hinckley has more than adequately established a prima facie case of a mental-illness defense as required by the rule. Accordingly, we conclude that based on this record, the district court abused its discretion by depriving Hinckley of the opportunity to establish a mental-illness defense at trial.

---

[4] The State makes an additional argument that voluntary intoxication is inherently incompatible with a defense of mental illness. The reports, however, do not indicate any voluntary intoxication on the day of the events at issue here, and, for purposes of the prima facie mental illness determination, we therefore need not reach the State's argument that voluntary intoxication is incompatible with a mental-illness defense.

B.

Although we conclude that the district court abused its discretion, Hinckley is not entitled to a reversal of his convictions if the State is able to prove that the court's error was harmless beyond a reasonable doubt.[5] " 'When an error implicates a constitutional right, we will award a new trial unless the error is harmless beyond a reasonable doubt.' " *State v. Lee*, 929 N.W.2d 432, 440 (Minn. 2019) (quoting *State v. Davis*, 820 N.W.2d 525, 533 (Minn. 2012)). "For an error to be harmless beyond a reasonable doubt, the jury's verdict must be 'surely unattributable' to the error." *State v. Gilleylen¸* 993 N.W.2d 266, 278 (Minn. 2023) (quoting *State v. Courtney*, 696 N.W.2d 73, 80 (Minn. 2005)).

We consider next what effect this error had on the jury verdict. The error here was harmless only if, after considering all of the evidence (including the mental-illness defense rejected by the district court), there is no possible way a reasonable jury would find Hinckley not guilty of the charged offenses by reason of mental illness.

Here, we cannot say that the State has established the jury's verdict was surely unattributable to the error. The evidence of mental illness submitted by Hinckley's expert, although not conclusive, was strong and reinforced by three separate reports, and as a consequence of the error, Hinckley was deprived of the opportunity to present additional evidence (and to examine and cross-examine witnesses) in the second phase of the trial, as

---

[5] Hinckley argues that the court's error should be treated as a structural error requiring automatic reversal. *See State v. Shoen*, 598 N.W.2d 370, 375 (Minn. 1999) (citing *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991)). But because we conclude that the error was not harmless beyond a reasonable doubt, we need not, and do not, decide whether a structural error occurred.

set out in the rule.[6] The State has not proven that the error here—precluding the jury from hearing Hinckley's evidence about his mental illness and considering whether Hinckley's criminal liability should be excused because of that mental illness—surely had no impact on the verdict.

## CONCLUSION

For the foregoing reasons, we reverse Hinckley's convictions and remand for further proceedings consistent with this opinion.

Reversed and remanded.

---

[6] We emphasize that our opinion deals only with whether Hinckley has met his prima facie burden to present a mental-illness defense. Issues of credibility, the weight to be given to evidence presented by the parties, and determination of the ultimate issue of competence as provided by Rule 20.02 of our criminal rules, are all matters to be determined by the fact finder.